1                    UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
2                        ORLANDO DIVISION

3            CASE NO:  6:08-CR-176-ORL-28GJK

4    UNITED STATES OF AMERICA,

5                              PLAINTIFF,

6    VS.

7    FRANK L. AMODEO,

8        DEFENDANT. _____

9                    TUESDAY, SEPTEMBER 23, 2008
                    CHANGE OF PLEA HEARING
10           BEFORE THE HONORABLE GREGORY J. KELLY
                UNITED STATES MAGISTRATE JUDGE
11   _____

12

13   APPEARANCES:

14   COUNSEL FOR PLAINTIFF:
     I. Randall Gold, AUSA
15

16   COUNSEL FOR DEFENDANT:
     Harrison Slaughter, Esq.
17

18

19

20

21   OFFICIAL COURT REPORTER:  KORETTA E. STANFORD, RPR-CRR

22   *PROCEEDINGS RECORDED STENOGRAPHICALLY;
      COMPUTER-AIDED TRANSCRIPTION*
23

24

25

```
1                      P R O C E E D I N G S

2              (Commenced at 10:05 a.m.)

3              COURTROOM DEPUTY:  Case number

4    6:08-CR-176-ORL-28GJK; United States of America vs. Frank L.

5    Amodeo.

6              Counsel, please state your appearances for the

7    record.

8              MR. GOLD:  Good morning, Your Honor; on behalf of

9    the United States, Randy Gold.  Seated with me is IRS Special

10   Agent Richard Smith and Assistant U.S. Attorney Nicole

11   Andrejko.

12             THE COURT:  Good morning.

13             MR. SLAUGHTER:  Good morning, Your Honor; Harrison

14   Slaughter, along with Frank Amodeo, who is seated here today.

15             THE COURT:  Good morning, Mr. Slaughter.  It's my

16   understanding that your client desires to change his plea with

17   respect to certain counts.

18             MR. SLAUGHTER:  Yes, sir.

19             THE COURT:  Specifically, Counts 1, 7, 8, 10, and 27

20   of the indictment; is that correct?

21             MR. SLAUGHTER:  That's correct, Your Honor.

22             THE COURT:  All right.  Well, with that

23   understanding, let's go ahead and swear Mr. Amodeo.

24             (Defendant sworn.)

25             State your full name, please.
```

1            THE DEFENDANT:  Frank Louis Amodeo.

2            THE COURT:  All right.  Mr. Amodeo, you've heard

3     your counsel represent that it is your desire to change your

4     plea with respect to Counts 1, 7, 8, 10, and 27 of the

5     indictment; is that true, sir?

6            THE DEFENDANT:  Yes, sir.

7            THE COURT:  You understand that at this point and

8     time, you've been put under oath, and you're sworn to tell the

9     true, correct, sir?

10            THE DEFENDANT:  I do.

11            THE COURT:  And you understand that in order to

12     determine whether or not the Court should accept your desire

13     to enter a guilty plea, you're required to answer certain

14     questions, correct?

15            THE DEFENDANT:  Yes.

16            THE COURT:  All right.  Do we have a signed consent

17     to have the magistrate judge conduct the proceedings?

18            COURTROOM DEPUTY:  No, I forgot that.

19            THE COURT:  We don't have that document?

20            COURTROOM DEPUTY:  No.

21            THE COURT:  Do we have a waiver with respect to the

22     presentence investigation and report?

23            COURTROOM DEPUTY:  I forgot all of those, I'm sorry.

24            THE COURT:  Okay.

25            All right.  Mr. Amodeo, there are certain documents

1    that I'd like you and your counsel to review and to determine

2    whether or not it's appropriate for you to execute them.  The

3    first document is a consent to allow me as the magistrate

4    judge to conduct the proceedings this morning.

5           And the second document is a document that would

6    authorize the Probation Department to conduct a presentence

7    investigation and provide a report to the Court, which the

8    Court would use as a guide in determining your sentence.  If

9    you and your counsel will review those documents and determine

10   whether or not you're comfortable executing those, please let

11   us know, and then we'll resume proceedings.

12           I'd suggest that we take a brief recess,

13   Mr. Slaughter, while you and your client have an opportunity

14   to review those documents, okay?

15           MR. SLAUGHTER:  Your Honor, I'm very familiar with

16   these documents, and --

17           THE COURT:  I know, but I want to give your client

18   an opportunity to familiarize himself with them as well, okay?

19           MR. SLAUGHTER:  Okay.

20           THE COURT:  All right, thank you.

21           (Brief recess taken.)

22           All right.  Mr. Amodeo, I now have two documents in

23   front of me.  One is a notice regarding entry of a plea of

24   guilty.  Is this a document that you just reviewed and signed,

25   sir?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  All right.  You understand that by

3    executing this document, you're agreeing that I, as a

4    magistrate judge, can conduct the proceedings this morning and

5    provide the report and recommendation to the district court

6    judge in regard to whether or not your desire to enter a

7    guilty plea should be accepted; correct, sir?

8          THE DEFENDANT:  I do.

9          THE COURT:  Do you have any questions about the

10   consent form, sir?

11         THE DEFENDANT:  No, I don't.

12         THE COURT:  All right.  The other document I have is

13   a consent to institute a presentence investigation and

14   disclose that report before conviction or a plea of guilty.

15   Is this a document that you reviewed and signed this morning?

16         THE DEFENDANT:  Yes, it is.

17         THE COURT:  Okay.  You understand that by executing

18   this document you're agreeing that the Probation Department

19   can conduct a presentence investigation and provide a written

20   report to the district court judge, which the district court

21   judge would use in connection with determining your sentence,

22   correct?

23         THE DEFENDANT:  I do, yes.

24         THE COURT:  Do you have any questions about that

25   consent form or what it means, sir?

1              THE DEFENDANT:  No.

2              THE COURT:  All right.  Sir, in order to determine

3    whether or not your plea should be accepted, there are several

4    steps that we'll go through this morning.  First, I'm going to

5    ask you certain questions bearing on your competency.  I know

6    that Dr. Danziger testified yesterday, you were present during

7    his testimony, but I need to ask you certain questions in

8    order to determine whether or not you're competent to enter a

9    guilty plea here today, sir.

10             Second, we'll review the rights that you have and

11   the consequences of entering a guilty plea.  We'll review the

12   plea agreement, certain terms of the plea agreement in order

13   to ensure that you understand the terms of that document, sir.

14   Third, we'll review whether or not there's a factual basis for

15   you to enter a guilty plea.

16             Sir, I want to tell you that if you are not guilty

17   of each of the charges alleged, then you should not enter a

18   guilty plea.  It's your right to maintain your innocence and

19   require that the government prove that you're guilty beyond a

20   reasonable doubt at trial.  If there's no factual basis for

21   you to enter a guilty plea, the Court will not accept your

22   desire to enter a guilty plea.

23             And finally, if I'm satisfied that you're competent,

24   that you understand your rights and the rights that you'd be

25   waiving, you understand the terms of the plea agreement and

1    that there's a factual basis for you to enter a guilty plea,

2    sir, I'll ask you how you plead.  So, those are sort of the

3    steps that we're going to follow this morning.

4              Sir, how old are you?

5              THE DEFENDANT:  48.

6              THE COURT:  And what is the highest level of

7    education that you have, sir?

8              THE DEFENDANT:  A juris doctorate.

9              THE COURT:  And where did you obtain your JD degree

10   from?

11             THE DEFENDANT:  Emory University.

12             THE COURT:  And when did you obtain that, sir?

13             THE DEFENDANT:  1987.

14             THE COURT:  And did you practice law?

15             THE DEFENDANT:  I did.

16             THE COURT:  During what period of time?

17             THE DEFENDANT:  From '88 until '92.

18             THE COURT:  Okay.  And what type of law practice

19   were you engaged in from '88 until '92 during that four-year

20   period, sir?

21             THE DEFENDANT:  Primarily, bankruptcy practice.

22             THE COURT:  Okay.  And if you would, just summarize

23   your occupation, other than your legal occupation.

24             THE DEFENDANT:  I'm a turnaround consultant or a

25   crisis manager.

1        THE COURT:  Okay.  And during what period of time

2   did you work as a turnaround consultant?

3        THE DEFENDANT:  Principally, from 2000 to 2008.

4        THE COURT:  Okay.  In terms of your overall health,

5   setting aside for now your mental capacity, your overall

6   physical health, sir, are you in good health?

7        THE DEFENDANT:  Essentially, good health.  There's a

8   blood pressure and an asthma issue, but other than that, yes.

9        THE COURT:  Okay.  And are you taking medications to

10  manage those?

11       THE DEFENDANT:  I am.

12       THE COURT:  All right.  Sir, you read, speak, and

13  understand English, correct?

14       THE DEFENDANT:  I do.

15       THE COURT:  Are you currently under the care of a

16  psychiatrist or psychologist?

17       THE DEFENDANT:  I am.

18       THE COURT:  And are you under the care of one or the

19  other or both?

20       THE DEFENDANT:  Actually, it's still the team unit

21  at McLean Hospital, so it's both.

22       THE COURT:  Okay.  And who are your treating

23  physicians, sir?

24       THE DEFENDANT:  Dr. Vuckovic and Dr. Choras.

25       THE COURT:  What's the second doctor?

1                THE DEFENDANT:  Dr. Choras, C-h-o-r-a-s.

2                THE COURT:  All right.  Have you been diagnosed with

3    any specific mental illness, sir?

4                THE DEFENDANT:  Yes.  A bipolar condition with

5    schizo-aspect aspects and chronic delusional aspects.

6                THE COURT:  Are you taking medications at this point

7    and time, sir?

8                THE DEFENDANT:  I am.

9                THE COURT:  What medications are you taking?

10               THE DEFENDANT:  3,000 milligrams of Depakote daily,

11   8 grams of Geodon daily, and Labetalol is the way I pronounce

12   it, although that might be somewhat mistaken, 200 milligrams

13   daily.

14               THE COURT:  All right.

15               THE DEFENDANT:  And a sleep-inducing agent to

16   accelerate the other medicine, which is Razemore or

17   Metoprolol.

18               THE COURT:  And who has prescribed these

19   medications, sir?

20               THE DEFENDANT:  These were all prescribed by

21   Dr. Vuckovic.

22               THE COURT:  Have you taken those medications in the

23   prescribed dosage and at the prescribed times during the last

24   four days, sir?

25               THE DEFENDANT:  I have.

1          THE COURT:  Is that something that you have

2     self-administered?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Okay.  Are you certain that you've taken

5     the medications in the correct dosages?

6          THE DEFENDANT:  I am.

7          THE COURT:  Are you certain that you've taken them

8     at the correct times?

9          THE DEFENDANT:  I am.

10          THE COURT:  All right.  And do those medications, in

11     your opinion, adequately control your mental illnesses, sir?

12          THE DEFENDANT:  Yes.  They give me the ability to

13     control the mood swings.  They allow a much more --

14     considerably less racing thoughts than normal.

15          THE COURT:  Okay.  Do you feel that you're lucid at

16     this point and time?

17          THE DEFENDANT:  I am.

18          THE COURT:  Are you suffering from any condition

19     whatsoever within the last five days, which would impair your

20     ability to communicate fully with your counsel about the facts

21     of this case?

22          THE DEFENDANT:  No.

23          THE COURT:  Are you suffering from any impairment

24     whatsoever that would negatively impact your ability to assist

25     your counsel in defending the case against you, sir?

```
1                THE DEFENDANT:  No.

2                THE COURT:  Do you feel that you understand the

3    advice that your counsel has given you, sir?

4                THE DEFENDANT:  I do.

5                THE COURT:  Do you feel that you understand the

6    proceedings against you?

7                THE DEFENDANT:  Yes.

8                THE COURT:  Have you taken any other medications

9    whatsoever, other than those that you've outlined for me in

10   the hearing today during the last five days, sir?

11               THE DEFENDANT:  I have had a dose of Seroquel, which

12   is an additional anti-psychotic medication.

13               THE COURT:  Okay.

14               THE DEFENDANT:  And it was designed to help deal

15   with the -- to assist the Depakote in keeping the mood swings

16   normal.

17               THE COURT:  And when did you take the Seroquel?

18               THE DEFENDANT:  Yesterday.

19               THE COURT:  And what dose did you take, sir?

20               THE DEFENDANT:  I believe it's one capsule, a

21   hundred milligrams.  I might be wrong about the hundred

22   milligrams.

23               THE COURT:  And was that also prescribed by

24   Dr. Vuckovic?

25               THE DEFENDANT:  The Seroquel was actually prescribed
```

1    by Dr. Krotenberg, who was the treating psychiatrist locally

2    until I went to McLean.

3              THE COURT:  Okay.  And is that the only dosage of

4    any other medication that you've taken within the last five

5    days, sir?

6              THE DEFENDANT:  Yes, sir.

7              THE COURT:  So a single dose, 100 milligrams, of

8    Seroquel?

9              THE DEFENDANT:  Correct.

10             THE COURT:  And you took that yesterday at what

11   time, sir?

12             THE DEFENDANT:  In the morning.

13             MR. SLAUGHTER:  Your Honor, that was after probably

14   three conversations with Dr. Danziger.

15             THE DEFENDANT:  That's correct.

16             THE COURT:  Okay.  So, Dr. Danziger concurred with

17   respect to that dosage as well?

18             THE DEFENDANT:  Yes.

19             THE COURT:  All right.  In terms of Dr. Danziger,

20   Mr. Amodeo, when was the last time that you saw him?

21             THE DEFENDANT:  Before yesterday, it was Friday.

22             THE COURT:  Okay.

23              THE DEFENDANT:  So, it would be the 19th.

24             THE COURT:  All right.  So, you saw him on Friday,

25   the 19th?

1            THE DEFENDANT:  Correct.

2            THE COURT:  Okay.  How much time did you spend with

3    him?

4            THE DEFENDANT:  A little over an hour.

5            THE COURT:  And you've taken all medications

6    described by Dr. Vuckovic, again, in the appropriate dosages

7    and at the appropriate times since that meeting, correct?

8            THE DEFENDANT:  Yes, I have.

9            THE COURT:  It's your view that your medications do

10   adequately control the effects of your mental illness, sir; is

11   that correct?

12           THE DEFENDANT:  That's correct.

13           THE COURT:  Are you currently under the influence of

14   anything whatsoever that would negatively impact your ability

15   to understand the proceedings here today, sir?

16           THE DEFENDANT:  No.

17            THE COURT:  Are you having any difficulty

18   understanding me?

19           THE DEFENDANT:  I'm not.

20           THE COURT:  Are you clear-minded?

21           THE DEFENDANT:  Yes.

22           THE COURT:  Okay.  If at any point and time you have

23   difficulty understanding the proceedings or what's being said

24   by any person, just let me know, and you can interrupt the

25   proceedings to do so, okay, sir?

```
 1              THE DEFENDANT:  Yes.

 2              THE COURT:  I wish that you would interrupt the

 3    proceedings, if you believe that you fail to understand

 4    anything that's being said or any aspect of the proceeding

 5    today, okay, sir?

 6              THE DEFENDANT:  Yes, sir.

 7              THE COURT:  You'll do that for me?

 8              THE DEFENDANT:  I will.

 9              THE COURT:  Sir, in terms of your daily routines,

10    are you able to care for yourself?

11              THE DEFENDANT:  I am.

12              THE COURT:  Okay.  You're able to dress yourself,

13    groom yourself, take care of yourself in general ways?

14              THE DEFENDANT:  Yes.

15              THE COURT:  All right.  You're able to cook for

16    yourself?

17              THE DEFENDANT:  Yes.

18              THE COURT:  Okay.  In terms of driving, are you able

19    to drive, sir?

20              THE DEFENDANT:  I am.

21              THE COURT:  All right.  Do you think that you're

22    prepared to make a decision today about whether or not you

23    should plead guilty?

24              THE DEFENDANT:  I am.

25              THE COURT:  Are you prepared to make the best
```

1    decision for yourself in terms of that issue here today, sir?

2            THE DEFENDANT:  Yes.

3            THE COURT:  All right.  As I said, one of the things

4    we're going to do here is make sure that you understand the

5    nature of the charges against you and the consequences of

6    entering a guilty plea.  Sir, have you read the indictment?

7            THE DEFENDANT:  I have.

8            THE COURT:  You've read the entire indictment, sir?

9            THE DEFENDANT:  The entire document.

10           THE COURT:  Okay.  Do you believe you understand the

11   charges against you?

12           THE DEFENDANT:  I do.

13           THE COURT:  Okay.  Have you had an adequate

14   opportunity to confer with your counsel about the charges

15   against you?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Have you also discussed your defenses to

18   the charges against you?

19           THE DEFENDANT:  I have.

20           THE COURT:  You've discussed them with your counsel?

21           THE DEFENDANT:  Yes.

22           THE COURT:  And you've discussed the evidence in

23   support of the government's case, as well as in support of

24   your defenses, sir?

25           THE DEFENDANT:  Yes.

1          THE COURT:  I'm going to ask the government to go

2     ahead and summarize the charges that you're facing in terms of

3     those that you desire to enter a guilty plea with respect to

4     and the elements of those charges.  I'd like you to pay close

5     attention, because at the conclusion, I'm going to ask you

6     questions to ensure that you understand each of the charges

7     and the elements of the charges.  And, as a matter of fact,

8     Mr. Amodeo, you face several charges, so I'd like you to have

9     a pen and paper in front of you, so that you can jot down any

10    questions that you have as the government goes through the

11    charges, okay?

12         THE DEFENDANT:  Yes, sir.

13         THE COURT:  And, again, the rule that I described

14    earlier that you can interrupt at any point and time applies.

15    So, if you have a question and you want to interrupt, because

16    you don't understand some aspect of the charge, let us know,

17    and we'll try and provide clarification, okay?

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  All right.

20         MR. GOLD:  Your Honor, does the Court also want me

21    to discuss the maximum penalties at this time or are we going

22    to do that later?

23         THE COURT:  We can do the charges and elements, and

24    we can do the penalties at a later time, okay?

25         MR. GOLD:  Okay.  He has agreed to plead guilty to

1    Count 1, which is a conspiracy to commit wire fraud, to

2    obstruct an agency proceeding, and to impair and impede the

3    IRS's ability to assess and collect payroll taxes.  Counts 7,

4    8, and 10 each charge him with failure to collect and remit

5    payroll taxes.  And Count 27 charges him with obstruction of

6    an agency proceeding.

7            As to Count 1, the elements are first, that two or

8    more persons in some way or manner came to a mutual

9    understanding to try to accomplish a common and unlawful plan;

10   second, that the defendant knowing the unlawful purpose of the

11   plan, willfully joined in it; third, that one of the

12   conspirators during the existence of the conspiracy knowingly

13   committed at least one of the methods or overt acts; and

14   fourth, that such overt act was knowingly committed at or

15   about the time alleged in an effort to carry out or accomplish

16   some object of the conspiracy.

17           The elements for Counts 7, 8, and 10 are first that

18   the defendant was a person who had a duty to collect,

19   truthfully account for, and pay over federal income and social

20   security taxes that the defendant was required to withhold

21   from the wages of employees with the charged calendar

22   quarters.  Second, that the defendant failed to collect or

23   truthfully account for and pay over federal income and social

24   security taxes that the defendant was required to withhold

25   from the wages of employees for said calendar quarter.  And

1    third, that the defendant acted willfully.  The elements of

2    Count 27 are first that there was an agency proceeding, second

3    that the defendant was aware of that proceeding, and third

4    that the defendant intentionally endeavored corruptly to

5    influence, obstruct, or impede the pending proceeding.

6              THE COURT:  Thank you.

7              Mr. Amodeo, do you believe that you understand Count

8    1 that you're facing in terms of conspiracy to commit wire

9    fraud?

10             THE DEFENDANT:  Yes, sir.

11             THE COURT:  Do you believe you understand the

12   elements of that charge?

13             THE DEFENDANT:  I do.

14             THE COURT:  Do you have any question about the

15   charge or the elements of the charge, sir?

16             THE DEFENDANT:  No, sir.

17             THE COURT:  Do you understand the three elements

18   that the government just outlined that it would be required to

19   prove that you're guilty beyond a reasonable doubt with

20   respect to the conspiracy to commit wire fraud charge?

21             THE DEFENDANT:  Yes, sir.

22             THE COURT:  All right.  In terms of Counts 7, 8, and

23   10, which charges you with failure to collect and remit

24   payroll taxes, sir, do you believe you understand those

25   charges?

1           THE DEFENDANT:  I do.

2           THE COURT:  Do you believe that you understand the

3   elements of that charge?

4           THE DEFENDANT:  I do.

5           THE COURT:  Do you have any question whatsoever

6   about the three elements of that charge?

7           THE DEFENDANT:  No.

8           THE COURT:  In terms of Count 27, which charges you

9   with obstruction of an agency proceeding, sir, do you believe

10  you understand that charge?

11          THE DEFENDANT:  I do.

12          THE COURT:  Okay.  Do you believe you understand the

13  three elements of that charge as outlined by the government?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Do you have any questions whatsoever

16  about the charges that you're facing or the elements of those

17  charges, sir?

18          THE DEFENDANT:  No.

19          THE COURT:  Mr. Slaughter, at this point and time,

20  have you had an adequate opportunity to review the

21  government's case?

22          MR. SLAUGHTER:  Yes, sir.

23          THE COURT:  Okay.  Is there anything that you asked

24  the government to provide that you feel you were denied?

25          MR. SLAUGHTER:  No, and vice versa.

1           THE COURT:  Have you had an adequate opportunity to

2    advise your client on whether or not it's prudent for him to

3    enter a guilty plea with respect to the charges that we're

4    discussing here today?

5           MR. SLAUGHTER:  Yes, sir.

6           THE COURT:  And are you satisfied that it is in your

7    client's best interest at this point --

8           MR. SLAUGHTER:  Absolutely.

9           THE COURT:  Mr. Amodeo, how many times have you

10   conferred with your counsel about this case?

11          THE DEFENDANT:  Oh, it has to be 500.

12          THE COURT:  Okay.

13          THE DEFENDANT:  This has been going on for a couple

14   of years.

15          THE COURT:  Okay.  And, again, in those discussions,

16   you have had an opportunity to address the charges against

17   you, correct?

18          THE DEFENDANT:  Yes.

19          THE COURT:  And you've also addressed the defenses

20   that you may have to those charges, correct?

21          THE DEFENDANT:  Yes.

22          THE COURT:  Have you discussed the evidence for and

23   against you?

24          THE DEFENDANT:  Yes.

25          THE COURT:  And have you discussed the penalties

1    that you're facing, sir?

2                THE DEFENDANT:  Yes.

3                THE COURT:  Have you also discussed your rights

4    associated with trial?

5                THE DEFENDANT:  Yes.

6                THE COURT:  And have you discussed whether or not

7    it's in your best interest to enter a guilty plea, sir?

8                THE DEFENDANT:  Yes.

9                THE COURT:  Do you have a clear understanding of the

10   communications that you've had with your counsel about those

11   issues?

12               THE DEFENDANT:  I do.

13               THE COURT:  Is there any aspect of your discussions

14   with your counsel about those issues that you feel you really

15   don't grasp or understand, sir?

16               THE DEFENDANT:  No.

17               THE COURT:  Are you satisfied with the services of

18   your counsel in this matter, sir?

19               THE DEFENDANT:  I am.

20               THE COURT:  Is there any aspect of your counsel's

21   representation that you have reservations about, sir?

22               THE DEFENDANT:  No.

23               THE COURT:  Counsel for the parties, are there any

24   additional questions that you wish me to ask Mr. Amodeo about

25   his competency to enter a guilty plea?

1          MR. GOLD:  No, Your Honor.  I believe he's competent

2  at this time.

3          THE COURT:  All right.

4          MR. SLAUGHTER:  Your Honor, I believe, he's

5  competent and very clear headed today.

6          THE COURT:  All right.

7          Yes, Mr. Slaughter, you had made a comment --

8  actually, counsel for both parties made a comment that you

9  felt that when Mr. Amodeo was not taking his medications, that

10  that was fairly self-evident.  You recall those comments,

11  correct?

12          MR. GOLD:  Yes, sir.

13          THE COURT:  Have you both had an opportunity to

14  confer with Mr. Amodeo today or have any discussions with him?

15          MR. GOLD:  I certainly did yesterday and just very

16  briefly this morning.

17          THE COURT:  Okay.  And is it your impression that

18  he's on his medications?

19          MR. GOLD:  I believe he is.

20          THE COURT:  All right.  Mr. Slaughter, similarly, is

21  it your impression that he's on his medications?

22          MR. SLAUGHTER:  I agree that he's on his

23  medications.  And when he would come to our office, he would

24  set up the medications and his time tables, put them on top of

25  a table, and during the day would go over and take them at the

1    appropriate times.

2                  THE COURT:  Okay.

3                  MR. SLAUGHTER:  So, I mean, we have a dialogue about

4    it all the time.  And just to getting back to the Court's

5    questions about whether Mr. Gold has seen him when he's not

6    taking it, the cooperation to get us here today started on

7    February 9 of 2007, so there may have been as many as 30

8    meetings in which Mr. Amodeo was present, and we all saw the

9    cycling that was occurring.

10                  THE COURT:  Okay.

11                  MR. SLAUGHTER:  Which is rare now.

12                  THE COURT:  All right.  When he was on his

13    medications, was he always lucid?

14                  MR. SLAUGHTER:  On the medications, he's 150 percent

15    better than when he was not on his medications.

16                  THE COURT:  Okay.

17                  MR. SLAUGHTER:  I mean, sometimes he may appear

18    sleepy, that type of stuff.

19                  THE COURT:  Okay.  But other than fatigue --

20                  MR. SLAUGHTER:  Right.

21                  THE COURT:  -- he was always lucid?

22                  MR. SLAUGHTER:  Right.  Oh, absolutely.

23                  THE COURT:  All right.

24                  MR. SLAUGHTER:  And when that happens, we just start

25    giving him tea and Coca-Cola.

1              THE COURT:  Okay.

2              Mr. Amodeo, tell me in your own words in regard to

3    the proceedings against you, what is the role of Mr. Gold?

4              THE DEFENDANT:  Mr. Gold's role is to represent the

5    United States and show the Court that I violated the United

6    States' laws.

7              THE COURT:  Okay.  And what is the role of your

8    counsel, Mr. Slaughter?

9              THE DEFENDANT:  He is to provide evidence in my

10   defense and show that the government failed to prove I

11   violated United States' laws.

12             THE COURT:  All right.  And if the case were to go

13   to trial, what is your understanding of the role that the

14   judge would play?

15             THE DEFENDANT:  The judge would make decisions on

16   legal matters, and the jury would make decisions on factual

17   matters.

18             THE COURT:  In terms of the charges against you,

19   sir, with respect to Count 1 that charges you with conspiracy

20   to commit wire fraud, in your own words, what is your

21   understanding of that --

22             MR. GOLD:  Your Honor, actually, it's a three-prong

23   conspiracy.  There's actually three separate objects, one of

24   which was the wire fraud, one of which is the obstruction of

25   agency proceedings, and the third prong is to impair or impede

1    the IRS' ascertainment or collection of the payroll taxes.

2              THE COURT:  All right.

3              Sir, Mr. Amodeo, in terms of Count 1 of the

4    indictment, in your own words, what is your understanding of

5    the charge against you?

6              THE DEFENDANT:  That I agreed and assisted -- I

7    agreed with other people and allowed them or assisted them to

8    not pay payroll taxes and transfer the money through corporate

9    accounts which I had control over.

10             THE COURT:  Do you understand that one of the

11   underlying elements of that claim is that the conspiracy was

12   intended to perpetrate wire fraud?

13             THE DEFENDANT:  Yes, sir.  I mean, I thought it was

14   to perpetrate the nonpayment of the taxes.

15             THE COURT:  Well, nonpayment of the taxes, I

16   believe, is one of the elements as well, correct, Mr. Gold?

17             MR. GOLD:  Well, it is one of the prongs, yes, sir.

18             THE COURT:  Okay.

19             In terms of -- you understand that there is three

20   underlying crimes alleged.  One is with respect to wire fraud,

21   the other is obstruction of justice, and the other is

22   impairment of the IRS proceedings; do you understand, sir?

23             THE DEFENDANT:  There are three different

24   conspiracies or there's one conspiracy with three different

25   parts?

```
 1              MR. GOLD:  One conspiracy with three different

 2   parts.

 3              THE DEFENDANT:  Then, I understand, yes.

 4              THE COURT:  Okay.  There's one conspiracy with three

 5   different parts.

 6              THE DEFENDANT:  Yes.

 7              THE COURT:  Those being the three parts.

 8              THE DEFENDANT:  I understand that.

 9              THE COURT:  Okay.  And you understand that the

10   government would be required to prove, beyond a reasonable

11   doubt, that you participated in the conspiracy knowingly and

12   intentionally, correct?

13              THE DEFENDANT:  Yes, I do.

14              THE COURT:  Okay.  Any questions about the

15   government's burden of proof or the elements?

16              THE DEFENDANT:  No, I understand that.

17              THE COURT:  All right.  Sir, in terms of Counts 7,

18   8, and 10, which allege failure to collect and remit payroll

19   taxes, in your own words, what is it that you've been charged

20   with there?

21              THE DEFENDANT:  I am -- that I would have had a duty

22   to know that the companies which were under my ownership, even

23   indirectly, had an obligation to pay taxes and that I

24   intentionally failed to ensure that those taxes were paid.

25              THE COURT:  Okay.  In terms of Count 27, which
```

1    alleges obstruction of an agency proceeding, sir, in your own

2    words, what is your understanding of that charge?

3              THE DEFENDANT:  An attorney officer of one of the

4    companies came to me and told me a presentation I made put our

5    conduct in a bad light, made me subject to commit to federal

6    offenses, and that I should change the way I present it to the

7    IRS.  And I took her recommendation, and a couple hours later

8    I changed the presentation manner in which the circumstances

9    would be portrayed to the government.

10             THE COURT:  Okay.  And when you changed your account

11   of the facts, sir, you were changing it to an account that was

12   not truthful; is that correct?

13             THE DEFENDANT:  Changing an account that was

14   misleading.

15             THE COURT:  Okay.  And you understand that it's the

16   government's burden of proof that you're guilty of that beyond

17   a reasonable doubt, and they would have to establish that you

18   acted intentionally, correct?

19             THE DEFENDANT:  Yes, I understand that.

20             THE COURT:  Okay.

21             All right.  Mr. Amodeo, based on your testimony, as

22   well as the unconverted testimony of Mr. Danziger yesterday, I

23   find that you're competent to enter a guilty plea, if you so

24   desire.  Based on the testimony that's been provided, I

25   specifically find that you have the ability to adequately work

1    with your counsel in regard to the defense of your case and,

2    furthermore, that you understand the nature and consequences

3    of the proceedings against you.

4              Sir, has anyone done anything that you believe is

5    wrong or unfair in order to cause you to enter a guilty plea?

6              THE DEFENDANT:  No, sir.

7              THE COURT:  Has anyone threatened you, coerced you,

8    intimidated you, or put any improper pressure upon you in

9    order to cause you to enter a guilty plea?

10             THE DEFENDANT:  No, sir.

11             THE COURT:  Sir, do you have a copy of the plea

12   agreement in front of you?

13             THE DEFENDANT:  I do.

14             THE COURT:  Is the original plea agreement here in

15   court?

16             MR. GOLD:  Yes, Your Honor, it is.

17             THE COURT:  Okay.

18             MR. GOLD:  Would you like it?

19             THE COURT:  No, that's fine.  I have a true and

20   accurate copy, I believe.

21             MR. GOLD:  Okay.

22             THE COURT:  If you would, provide the original to

23   Mr. Amodeo, I'd appreciate it.

24             MR. GOLD:  Certainly, Your Honor.

25             THE COURT:  I may have some questions for him.

1                    (Counsel provides defendant with original.)

2                    Mr. Amodeo, if you would take a moment to review

3    that document, that is the original.  I'd like you to verify

4    that that is the plea agreement that you've signed, sir.

5                    (Pause in proceedings while the defendant reviews.)

6                    THE DEFENDANT:  It is, Your Honor.

7                    THE COURT:  Your signature appears on the last page

8    of the plea agreement; is that correct, Mr. Amodeo?

9                    THE DEFENDANT:  It does.

10                   THE COURT:  And your initials appear on each and

11   every page of the plea agreement; is that correct?

12                   THE DEFENDANT:  Yes.

13                   THE COURT:  Did you read the entire plea agreement

14   before you signed it, sir?

15                   THE DEFENDANT:  I did.

16                   THE COURT:  Did you discuss the plea agreement with

17   your counsel before you signed it, sir?

18                   THE DEFENDANT:  I did.

19                   THE COURT:  Did you have an adequate opportunity to

20   confer with your counsel and to receive his advice before you

21   signed the plea agreement?

22                   THE DEFENDANT:  Yes.

23                   THE COURT:  Did you ask your counsel questions about

24   the plea agreement?

25                   THE DEFENDANT:  I did.

1          THE COURT:  And do you feel that your questions were

2    adequately answered?

3          THE DEFENDANT:  They were.

4          THE COURT:  Do you believe that you understand the

5    terms of the plea agreement, sir?

6          THE DEFENDANT:  I do.

7          THE COURT:  Mr. Gold, if you would, would you

8    summarize the principal benefits to Mr. Amodeo of entering

9    into this plea agreement.

10         MR. GOLD:  Yes, Your Honor.

11         First of all, there will be no further charges

12   arising out of the conduct, which gave rise to the plea

13   agreement.  We are going to recommend a guideline sentence.

14   There is a provision for restitution to the victims for any of

15   the employers that are required to repay the Internal Revenue

16   Service, if that comes to pass, and he has an obligation to

17   pay that money.

18         In there is a provision for acceptance of

19   responsibility, two levels, if it's up to Level 15.  But if

20   it's 16 or greater, three levels, assuming nothing else comes

21   along to our attention.

22         We're going to recommend that he receive a

23   four-level upward adjustment for his role in the offense.  We

24   are jointly recommending with the defense no upward or

25   downward departure, with the exception that he will retain the

1    ability to recommend to the sentencing court that he receive a

2    downward departure for diminished capacity, pursuant to the

3    Sentencing Guidelines Section 5K2.13.  Not that the government

4    agrees, but he is retaining the ability to argue that.

5              THE COURT:  Okay.

6              MR. GOLD:  There is also provisions in here that

7    would allow him to cooperate with the United States and to

8    allow us to then review his cooperation and potentially file

9    either a 5K1, based upon substantial assistance or thereafter

10   Rule 35.  And there's a provision for the payment of the taxes

11   from 2004, through and including 2006, and then about ten

12   pages dealing with the forfeiture of assets.  I know I may

13   have gone beyond just what we may have promised him.

14             THE COURT:  Okay.

15             MR. GOLD:  But I think I've gotten the provisions in

16   there.

17             THE COURT:  All right.  I have a couple questions

18   for counsel about the plea agreement.  Specifically, with

19   respect to Section A.12., subparagraph b.(5), there's a

20   provision in here about what would occur in the event that

21   Mr. Amodeo provides false testimony or falsely implicates or

22   incriminates another person.

23             There were certain conditions that would apply.  And

24   specifically, under 12.b.(5), it says "The defendant would not

25   be permitted to withdraw the guilty plea to those counts to

1    which defendant hereby agrees to plead in the instant case,

2    but in that event, defendant will be entitled to the

3    sentencing limitations, if any, as set forth in this plea

4    agreement..."

5            As I've looked at the plea agreement, there are

6    certain recommendations.  But in each instance, the agreement

7    specifically provides that those recommendations are not

8    binding on the Court, and the defendant acknowledges that.

9    Are there any limitations on sentencings set forth in this

10   plea agreement whatsoever?

11           MR. GOLD:  Not other than what we've previously

12   discussed, the five counts, which would be a total of 25

13   years, and then all the other recommendations.

14           THE COURT:  Okay.

15           Mr. Slaughter, are you clear on that?

16           MR. SLAUGHTER:  That's correct.  There's also an

17   agreement that would permit Mr. Amodeo to contest that a

18   hearing down the road, whether the first 8 million that he

19   received was stolen money and not subject to forfeiture, and

20   that would also hold on -- go over to the two houses, and

21   they're marked out in the plea agreement.

22           THE COURT:  Okay.  So, there are factual issues in

23   terms of forfeiture, but in terms of --

24           MR. SLAUGHTER:  They wouldn't be decided today, but

25   would be decided later in court.

1          THE COURT:  Okay.  But in terms of sentencing,

2   incarceration, supervised release, fines, those matters, there

3   are no limitations whatsoever in this plea agreement, are

4   there?

5          MR. SLAUGHTER:  This document contains them all.

6          MR. GOLD:  No, Your Honor, there are no other

7   limitations.

8          THE COURT:  Have you advised your client on that?

9          MR. SLAUGHTER:  Yes, he's aware of that.

10          THE COURT:  Okay.

11          The other question I have is looking at page 18 of

12   the agreement, and this is in the section dealing with

13   forfeiture, forfeiture which begins on Section A.16., page 10,

14   and then continues on.  On page 18 at the bottom of the page,

15   it says, "The defendant admits and agrees that the conduct

16   described in the Factual Basis above provides a sufficient

17   factual and statutory basis for forfeiture of the property

18   sought by the government."

19          MR. GOLD:  That should be below.

20          THE COURT:  Well, that's what I was inquiring about,

21   because there are facts, I believe, set forth above which are

22   not in the factual basis below, and --

23          MR. GOLD:  We could insert the words above and

24   below.

25          THE COURT:  Okay.  I think, Mr. Slaughter, if you

1    need to examine this and review it with your client, that's

2    fine.  My impression in reading it was that that was perhaps a

3    typographical error in terms of just capitalizing factual

4    basis, and what would be referenced would be the facts

5    outlined above as well as the facts set forth below.

6         Because if you look earlier at the top of the page,

7    there's a reference to the fact that the corporations

8    identified above were funded exclusively with the proceeds of

9    the fraud scheme described below, and the scheme was Amodeo's

10   sole source of income.  And that is a statement I don't think

11   that's in the factual basis below.  So, are the parties

12   relying on that statement, as well as the factual basis below?

13        MR. GOLD:  Above and below, Your Honor.

14        And actually, there is language in the statement of

15   facts that perhaps was not picked up in the forfeiture

16   language that discusses the 172 million versus 181 million.

17   It's approximately an $8 million, $9 million difference.  And

18   with that exception, it was the sole income, and he's retained

19   the ability to argue to the sentencing judge that that

20   original 8 million, in his mind, may be fees as opposed to the

21   stolen tax money.

22        THE COURT:  Right.  He was retaining an argument for

23   the Court to resolve later that he was paid approximately 9

24   million dollars in commissions or fees, correct?

25        MR. GOLD:  That's correct, Your Honor.

1          THE COURT:  And that's the reason for the delta

2    between the 172 million and the 181 million, correct?

3          MR. GOLD:  Yes, sir.

4          THE COURT:  Okay.

5          All right.  Mr. Slaughter, with the modification

6    proposed by the government in terms of making that language

7    read, "...the facts outlined above and those set forth in the

8    factual basis below...," be acceptable?

9          MR. SLAUGHTER:  Yes, Your Honor.

10         THE COURT:  If you would interlineate that on the

11   original and review it with your client and initial it.

12         (Pause in proceedings.)

13         MR. SLAUGHTER:  We've initialed them, Your Honor.

14         MR. GOLD:  And, Your Honor, I'll read you the

15   language as now written, and if the Court wants I can refile

16   this plea agreement in toto or just the one page.  It's the

17   Court's pleasure.

18         THE COURT:  If you would, just file the entire plea

19   agreement, okay?

20         MR. GOLD:  Okay.

21         THE COURT:  All right.  And the language, then,

22   we're on page 18, the paragraph at the very bottom that would

23   carry over to page 19; is that correct?

24         MR. GOLD:  Yes, sir.  And it reads, "The defendant

25   admits and agrees that the conduct described above and in the

1  factual basis below provides a sufficient factual and

2  statutory basis...," et cetera.

3          THE COURT:  Okay, thank you.

4          MR. GOLD:  Now, does the Court want me to put

5  amended when we refile the plea agreement?

6          THE COURT:  You can indicate amended on it, that's

7  fine.

8          MR. GOLD:  Okay.

9          THE COURT:  Has it been initialed by counsel for

10  both parties?

11          MR. GOLD:  Yes.

12          THE COURT:  As well as by Mr. Amodeo?

13          MR. GOLD:  Yes.

14          MR. SLAUGHTER:  Yes, sir, blue ink.

15          MR. GOLD:  I think, what I'll do is handwrite in the

16  word amended and we'll both initial and it'll be filed.

17          THE COURT:  Okay, thank you.

18          Mr. Amodeo, once the original is back in front of

19  you, I have some questions to ask you, okay?

20          First of all, Mr. Amodeo, you have the amended plea

21  agreement in front of you, correct?

22          THE DEFENDANT:  Yes, sir.

23          THE COURT:  Okay.  Has the government made any

24  promises or representations to you to induce you to enter into

25  a plea agreement, other than those set forth in the document

1    in front of you, sir?

2              THE DEFENDANT:  No, sir.

3              THE COURT:  Has any other person or entity made any

4    promises or representations to you whatsoever that you're

5    relying upon in order to enter into the plea agreement, other

6    than those promises set forth in the document, sir?

7              THE DEFENDANT:  No, sir.

8              THE COURT:  Sir, in terms of sentencing, there is

9    several provisions in here that have been briefly summarized

10   by Mr. Gold in terms of sentencing, specifically, if you

11   would, turn to Section A.6. On page 4.  It sets forth that the

12   United States will recommend that you be sentenced within the

13   applicable guideline range as determined by the Court,

14   pursuant to the Sentencing Guidelines.  Do you see that, sir?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Okay.  You understand that in regard to

17   sentencing, the Court is not a party to this agreement,

18   correct?

19             THE DEFENDANT:  Yes, I understand that.

20             THE COURT:  The Court is not bound by this agreement

21   in any way, correct?

22             THE DEFENDANT:  Yes.

23             THE COURT:  The only parties to this agreement are

24   you and the U.S. Attorney's Office for the Middle District of

25   Florida, correct?

38

1                    THE DEFENDANT:  Yes.

2                    THE COURT:  Okay.  So, you understand that the Court

3       has discretion to accept or reject any recommendation that is

4       made by you or by the parties collectively with respect to

5       your sentencing, correct?

6                    THE DEFENDANT:  I do.

7                    THE COURT:  All right.  Similarly, with respect to

8       Section A.7., those same principles apply, correct, sir?

9                    THE DEFENDANT:  Yes.

10                    THE COURT:  Any questions about that?

11                    THE DEFENDANT:  No.

12                    THE COURT:  The same principles would apply with

13       respect to Section A.8.  Do you have any questions about that,

14       sir?

15                    THE DEFENDANT:  I don't.

16                    THE COURT:  And similarly, with respect to Section

17       A.9. And A.10., the same rules would apply.  Any questions

18       about that?

19                    THE DEFENDANT:  No.

20                    THE COURT:  With respect to Section A.10. In regard

21       to cooperation or substantial assistance, sir, you understand

22       that the determination in terms of whether or not you qualify

23       for substantial assistance is solely the decision of the U.S.

24       Attorney's Office, correct?

25                    THE DEFENDANT:  Yes.

1          THE COURT:  Okay.  And because that's their decision

2    and they can make it in their discretion, you understand that

3    if they decide not to file a motion giving you credit for

4    substantial assistance, that you'll have no basis upon which

5    to challenge that, correct, sir?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Okay.  Furthermore, sir, in terms of the

8    recommendations made by the parties and whether or not the

9    government files a motion requesting that you be given credit

10   for substantial assistance, you understand that if things

11   don't go as you like in terms of sentencing in regard to the

12   Court accepting the recommendations and/or the government

13   making a motion for substantial assistance, you would not be

14   allowed to withdraw your guilty plea, correct, sir?

15         THE DEFENDANT:  Yes, I understand.

16         THE COURT:  Do you have any questions about that?

17         THE DEFENDANT:  No.

18         THE COURT:  Furthermore, sir, there's certain

19   stipulated facts in the plea agreement.  You understand that

20   the Court may use those facts in determining what sentence

21   would be appropriate, correct?

22         THE DEFENDANT:  Yes.

23         THE COURT:  Do you understand that the Court is not

24   bound by or limited by those facts?  The Court could consider

25   additional facts in determining your sentence.

1          THE DEFENDANT:  Yes.

2          THE COURT:  Sir, as set forth on page 20 of your

3   plea agreement, it provides that the United States is not

4   limited to the forfeiture described in the agreement; do you

5   understand that?

6          THE DEFENDANT:  I do.

7          THE COURT:  Do you understand that the government

8   could seek to obtain forfeiture of any assets that it believes

9   are the result of the fraudulent scheme alleged in the

10  indictment, correct?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Furthermore, on page 21, it provides

13  that forfeiture of your assets shall not be treated as a

14  satisfaction of any fine, restitution, cost of imprisonment,

15  or any other penalty imposed by the Court; do you understand

16  that, sir?

17         THE DEFENDANT:  I do.

18         THE COURT:  Do you have any questions about that?

19         THE DEFENDANT:  No.

20         THE COURT:  So, you would not be given credit

21  against any fine, penalty, or cost of imprisonment imposed by

22  the Court for the assets you forfeited; do you understand?

23         THE DEFENDANT:  I do.

24         THE COURT:  Similarly, on page 21 under Section

25  B.1., it provides that there is no limitation in this

1    agreement with respect to the fines that could be imposed; do

2    you understand that, sir?

3              THE DEFENDANT:  I'm sorry, Your Honor, where?

4              THE COURT:  I'm on page 21, sir, under Section B.1.,

5    the very last sentence.  Do you understand that under that

6    term, there is no limitation on the fines that could be

7    imposed by the Court in regard to sentencing?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  Sir, on page 23 under Section B.5.,

10   there's a waiver of your right to appeal.  Have you reviewed

11   that section, sir?

12             THE DEFENDANT:  I have.

13             THE COURT:  Do you understand that by executing this

14   agreement and entering a guilty plea pursuant to this

15   agreement, agree that you would be waiving a right to appeal

16   your sentence, except to the limited extent specifically set

17   forth in Section B.5. Of the agreement, correct?

18             THE DEFENDANT:  I do.

19             THE COURT:  And so, therefore, you would be waiving

20   your right to appeal your sentence, except to the extent that

21   your sentence exceeds the guideline range as determined by the

22   Court or to the extent the sentence exceeds the statutory

23   maximum or to the extent that the sentence constitutes a

24   violation of the 8th Amendment, which is a guarantee against

25   cruel and unusual punishment, or you would have the right to

1    appeal the sentence in the event that the government were to

2    appeal; do you understand?

3              THE DEFENDANT:  I do.

4              THE COURT:  Those are the only circumstances under

5    which you would appeal your sentence; do you understand?

6              THE DEFENDANT:  Yes.

7              THE COURT:  In addition, by entering into this

8    settlement agreement, you would be waiving your right to

9    collaterally attack your sentence; do you understand, sir?

10             THE DEFENDANT:  I do.

11             THE COURT:  Furthermore, sir, if you do enter a plea

12   of guilty, you'll be waiving your right to claim ineffective

13   assistance of counsel; do you understand that, sir?

14             THE DEFENDANT:  Yes, sir.

15             THE COURT:  Do you have any questions about waiving

16   that right, sir?

17             THE DEFENDANT:  That right is up to this point and

18   time, I presume, as opposed to proactively?

19             THE COURT:  Well, you would be waiving your right to

20   claim ineffective assistance of counsel through the entry of

21   your guilty plea, sir, with respect to any conduct --

22             THE DEFENDANT:  No, I don't.

23             THE COURT:  -- of counsel leading up to your entry

24   of a guilty plea.

25             THE DEFENDANT:  Your Honor, here's what I don't

43

1    understand about that.  I don't know what conduct's going to

2    occur in the future.  Yes, right now I have no problem with

3    counsel's conduct.  But I don't even know who the sentencing

4    counsel is necessarily going to be.  So, I don't know how I

5    could tell that I have ineffective assistance of counsel

6    before it's occurred.

7              THE COURT:  Okay.

8              MR. SLAUGHTER:  Your Honor, the plan is if this plea

9    goes through, I'm staying on, and we'll probably bring in

10   Mr. Sands.

11             THE COURT:  Okay.  So it's your plan to remain

12   counsel of record, if the plea is accepted?

13             MR. SLAUGHTER:  Yes, sir.

14             THE COURT:  Okay.

15             MR. GOLD:  Your Honor, may I speak with counsel just

16   one quick second?

17             THE COURT:  Sure.

18             (Pause in proceedings while counsel confer.)

19             MR. GOLD:  Your Honor, my understanding is slightly

20   different than perhaps Mr. Amodeo's, although I understand his

21   concerns.  But in terms of ineffective assistance of counsel,

22   it's any time up through and including the sentencing process.

23   Once the plea is entered and he is sentenced, it's any

24   ineffective assistance of counsel through that period he's

25   waiving.

1          THE COURT:  Mr. Amodeo, are you willing to waive any

2    right to claim ineffective assistance of counsel through

3    sentencing, sir?

4          THE DEFENDANT:  Your Honor, I've got to ask you

5    again, does that mean if there's something done between now

6    and then, I waive the right to object to it?

7          THE COURT:  Well, I can't advise you on that.

8    You're going to need to confer with your counsel about that.

9          (Pause in proceedings while attorney-client confer.)

10          THE DEFENDANT:  Yes, sir, I'll go ahead and waive

11    it.

12          THE COURT:  So you understand that by entering into

13    this plea agreement and pleading guilty, you would be waiving

14    your right to claim ineffective assistance of counsel through

15    sentencing, sir?

16          THE DEFENDANT:  I do.

17          THE COURT:  And you have no reservations whatsoever

18    about waiving any claim for ineffective assistance of counsel

19    at this point and time, do you, sir?

20          THE DEFENDANT:  No, sir.

21          THE COURT:  You understand that sentencing will take

22    place in the future, correct, sir?

23          THE DEFENDANT:  I do.

24          THE COURT:  You're willing to accept that waiver?

25          THE DEFENDANT:  Yes.

1            THE COURT:  All right.  Mr. Amodeo, next, we're

2    going to discuss the penalties that you're facing, if you do

3    plead guilty.  Although they're set forth in the plea

4    agreement, I'm going to ask the government to summarize the

5    penalties that you're facing for each count that you wish to

6    enter a guilty plea with respect to, and then we're going to

7    review those penalties.  So if you would, please pay close

8    attention, and be prepared to answer questions about the

9    penalties, okay?

10            THE DEFENDANT:  Yes, sir.

11            THE COURT:  Does anyone need a break or are we okay

12    to proceed?

13            MR. GOLD:  I'm okay.

14            THE COURT:  We're okay?  All right.

15            If you would.

16            MR. GOLD:  Yes, Your Honor.  As to all five of the

17    counts, the penalties are the same as to each one.  And that

18    is each count carries a maximum sentence of five years

19    imprisonment, a fine of $250,000, a term of supervised release

20    of not more than three years, and a special assessment of $100

21    per felony count, and each of these are.

22            Now, in this case, though, because this is a case

23    involving a financial gain or loss, pursuant to Title 18,

24    United States Code, Section 3571(d), a court could impose a

25    fine, which is not more than greater of twice the gain or

1    twice the gross loss.

2            So theoretically, with the amount of payroll taxes

3    being 181 -- well, between 172 and 181 million, theoretically,

4    the Court could impose a fine of between $344 million and $362

5    million.  And, obviously, there's also restitution that I

6    think we've previously discussed.

7            THE COURT:  All right.  So, he's facing a term of

8    five years of imprisonment for each one of the counts?

9            MR. GOLD:  Yes, sir.

10           THE COURT:  In terms of sentencing, those sentences

11   could be concurrent or consecutive, correct?

12           MR. GOLD:  The answer technically is yes, but with

13   the guidelines, assuming the Court were to go with the

14   guidelines, it's most likely there would have to be some type

15   of stacking up through the 25.

16           THE COURT:  Okay.  And what is your best guestimate

17   of the guideline range at this point and time?

18           MR. GOLD:  I think that the guidelines may very well

19   be in excess of the 25 years.

20           THE COURT:  Okay.  So then, in regard to each of the

21   counts, there's a penalty of a maximum term of imprisonment of

22   five years.  He's got five counts, so that would result in a

23   25-year term of incarceration?

24           MR. GOLD:  That's correct.  That would be the cap on

25   the amount of imprisonment would be 25 years.

1          THE COURT:  Okay.  And the guideline range is above

2    that is what you're saying?

3          MR. GOLD:  I believe, it may very well be.

4          THE COURT:  Okay.

5          MR. GOLD:  It effectively caps his sentence at 25

6    years.

7          THE COURT:  All right.  In terms of the fine, you've

8    got the $250,000 per charge, which times five is one and a

9    quarter million dollars.

10          MR. GOLD:  Subject to the other provision.

11          THE COURT:  Subject to the other provision that you

12    just mentioned, which is two times the gain or loss?

13          MR. GOLD:  Correct.

14          THE COURT:  Which could add another $362 million?

15          MR. GOLD:  Yes, sir.

16          THE COURT:  That's $181 million times two, right?

17          MR. GOLD:  Right, that's correct.

18          THE COURT:  And I understand that there's an issue

19    still remaining for resolution by the Court in terms of

20    whether it's $171 million loss caused or whether the loss

21    caused was $182 million, correct?

22          MR. GOLD:  Yes, sir.

23          THE COURT:  All right.  And in terms of supervised

24    release, it's not more than three years for each count, which

25    would add up to 15 years of supervised release?

1          MR. GOLD:  Yes, sir.

2          THE COURT:  Special assessment, the same thing, $100

3    times five counts, $500, correct?

4          MR. GOLD:  Yes, sir.

5          THE COURT:  Mr. Amodeo, do you believe that you

6    understand the penalties that you're facing as explained by

7    the government, if you enter a guilty plea, sir?

8          THE DEFENDANT:  I do.

9          THE COURT:  Okay.  Do you have any questions

10   whatsoever about the five-year term of imprisonment that you

11   face with respect to each individual count, sir?

12         THE DEFENDANT:  I don't.

13         THE COURT:  Do you understand that that could result

14   in a maximum term of imprisonment of up to 25 years, correct,

15   sir?

16         THE DEFENDANT:  I do, yes.

17         THE COURT:  Do you have any questions about that?

18         THE DEFENDANT:  No.

19         THE COURT:  Do you have any questions about the fine

20   of $250,000 per count that you're facing, sir?

21         THE DEFENDANT:  No, I don't.

22         THE COURT:  Do you have any questions about the

23   supervised release of up to three years that you're facing per

24   count, sir?

25         THE DEFENDANT:  No.

1            THE COURT:  Do you understand that supervised

2    release is a period of time after you've served any

3    incarceration where you would be subject to strict conditions,

4    and if you fail to abide by those conditions, you would be

5    returned to prison, correct, sir?

6            THE DEFENDANT:  I do.

7            THE COURT:  Any questions whatsoever about

8    supervised release and what it means?

9            THE DEFENDANT:  No.

10            THE COURT:  Has your counsel been able to answer all

11    of your questions adequately to your satisfaction about the

12    penalties that you're facing if you enter a guilty plea, sir?

13            THE DEFENDANT:  Yes.

14            THE COURT:  Do you still have any questions that you

15    want to ask counsel about the sentence that you're facing, if

16    you enter a guilty plea, sir?

17            THE DEFENDANT:  No, sir.

18            THE COURT:  Sir, again, you understand that a

19    different judge, a district court judge, someone other than

20    me, would handle the sentencing, if your guilty plea is

21    accepted, correct?

22            THE DEFENDANT:  Yes.

23            THE COURT:  Have you discussed with your counsel the

24    Sentencing Guidelines and how those may apply in regard to

25    your sentence?

1          THE DEFENDANT:  I have.

2          THE COURT:  You understand that the statutes that

3    you've been charged under provide a maximum penalty for each

4    count; however, the Court would use the Sentencing Guidelines

5    as a guide to determine what your sentence should be, correct,

6    sir?

7          THE DEFENDANT:  I understand that.

8          THE COURT:  Do you understand that there are a

9    variety of factors that the Court will consider in applying

10   the Sentencing Guidelines in regard to your sentencing, sir?

11         THE DEFENDANT:  Yes.

12         THE COURT:  Okay.  And you understand that those

13   factors include your criminal history, the conduct you engaged

14   in, whether there are any victims of the offense, whether or

15   not you engaged in obstruction of justice, whether or not you

16   accepted responsibility for your acts, and a variety of other

17   factors, correct?

18         THE DEFENDANT:  Yes.

19         THE COURT:  Have you discussed with your counsel

20   what guideline range may apply to you in regard to sentencing?

21         THE DEFENDANT:  I have.

22         THE COURT:  Do you understand that as we mentioned

23   at the outset that the Probation Office will prepare a report

24   and provide facts and recommendations to the judge that the

25   judge may use in connection with your sentencing, correct?

1          THE DEFENDANT:  Yes.

2          THE COURT:  You understand that you and your counsel

3    would receive a copy of that report, sir?

4          THE DEFENDANT:  Yes.

5          THE COURT:  Okay.  What's important for you to

6    understand is you may disagree with the version of the facts

7    set forth in the report.  And in that event, you would be able

8    to argue it and present evidence to the judge in regard to

9    what facts should govern your sentencing.  But what's

10   important for you to understand is that the Court may rule

11   against you and side with the Probation Office in terms of its

12   account of the facts.  Do you understand that, sir?

13         THE DEFENDANT:  I do.

14         THE COURT:  Do you have any questions about that

15   process or how it works?

16         THE DEFENDANT:  No.

17         THE COURT:  In regard to sentencing, sir, I want you

18   to understand that the Court has broad discretion in deciding

19   what sentence should be imposed on you; do you understand

20   that?

21         THE DEFENDANT:  I do.

22         THE COURT:  And each judge exercises his or her

23   discretion somewhat differently; do you understand?

24         THE DEFENDANT:  I do.

25         THE COURT:  Because of the things that we've

1    discussed in terms of the guideline ranges, how they would be

2    applied to you individually and the Probation Department

3    having to prepare its report, as well as the judge's

4    discretion, do you understand that at this point and time no

5    one can tell you precisely what guideline range would apply to

6    you, correct, sir?

7              THE DEFENDANT:  I do understand that.

8              THE COURT:  So, to the extent that you've had

9    discussions with your counsel or anyone else about what

10   guideline range would apply to you, you understand that at

11   this point and time all they can do is give you their best

12   guess about what guideline range would apply, right?

13             THE DEFENDANT:  Yes, I understand.

14             THE COURT:  And again, sir, you understand that the

15   Court has the right to reject all recommendations made by the

16   parties and sentence you up to the maximum term allowed by the

17   law; in this case, 25 years of incarceration, correct?

18             THE DEFENDANT:  I do.

19             THE COURT:  And if the Court were to do that, you

20   would have no right to withdraw your guilty plea, correct,

21   sir?

22             THE DEFENDANT:  Yes.

23             THE COURT:  Any questions about that?

24             THE DEFENDANT:  No.

25             THE COURT:  And that would also be the case in the

1    event that the judge were to sentence you beyond the guideline

2    range; do you understand that?

3              THE DEFENDANT:  Yes.

4              THE COURT:  In other words, the guideline range is

5    just a guideline, it's a recommendation, it's not binding on

6    the Court.  And so, the Court can sentence you up to the

7    maximum term allowed under the statutory provisions under

8    which you've been charged.

9              THE DEFENDANT:  I understand the sentence is up to

10   the judge, Your Honor.

11             THE COURT:  Also, sir, if you're aware of anyone

12   else who has been charged with a similar crime, I want you to

13   understand that you have no right to expect that you would

14   receive a sentence similar to that other person; do you

15   understand?

16             THE DEFENDANT:  Yes.

17             THE COURT:  Okay.  And that's because of the factors

18   we've been discussing.  Each judge exercises his or her

19   discretion independently.  Your sentence will be determined on

20   the facts of your case and based on certain reports and

21   recommendations, correct?

22             THE DEFENDANT:  Yes.

23             THE COURT:  In addition, sir, I want you to

24   understand that parole's been abolished.  And by that, I mean

25   to say that if you are sentenced to a term of incarceration,

1    you should expect to serve all or substantially all of the

2    term of incarceration; do you understand?

3              THE DEFENDANT:  Yes.

4              THE COURT:  Any questions about that?

5              THE DEFENDANT:  No.

6              THE COURT:  In terms of the fines and assessments

7    that may be imposed, do you have any questions about the fines

8    that the Court could impose in connection with your

9    sentencing, sir?

10             THE DEFENDANT:  No, sir.

11             THE COURT:  We've already outlined the $250,000 per

12   count, and we've also addressed the fact that the government

13   may seek a multiplier of two on any gain or loss sustained; do

14   you understand?

15             THE DEFENDANT:  Yes.

16             THE COURT:  In addition, as set forth in your plea

17   agreement, sir, the government is seeking forfeiture of a

18   variety of property.  First of all, they're seeking a money

19   judgment in the range of $172 million to $181 million, they're

20   seeking certain real property specifically outlined on page 11

21   of your plea agreement, and I'll give you a moment to make

22   sure that you're with me on the review of the forfeiture

23   items, sir.

24             THE DEFENDANT:  Yes.

25             THE COURT:  They're seeking a forfeiture of certain

1    vehicles described on page 11, as well as a Learjet, certain

2    promissory notes.  In addition, on page 12, they're seeking

3    forfeiture of certain seized funds, and that continues on to

4    page 13.  They're seeking all of the assets of the

5    corporations described on page 13 and continuing on through

6    page 17, including but not limited to any lawsuits or

7    settlement proceeds.  Do you understand, sir?

8              THE DEFENDANT:  I do.

9              THE COURT:  And again, even though there's an

10   extensive list of the items of forfeiture sought by the

11   government, you understand that the government may seek

12   additional forfeitures from you, correct, sir?

13             THE DEFENDANT:  Yes.

14             THE COURT:  You understand, sir, that in addition,

15   you could be ordered to make restitution to victims of the

16   crimes that have been alleged, correct?

17             THE DEFENDANT:  Yes.

18             THE COURT:  And by pleading guilty, sir, you

19   understand that you'd be losing certain civil rights,

20   including the right to vote, the right to possess firearms,

21   the right to serve on a jury, and to hold public office,

22   correct, sir?

23             THE DEFENDANT:  Yes.

24             THE COURT:  You understand that you'd be pleading

25   guilty to multiple felonies, correct, sir?

1                THE DEFENDANT:  Yes.

2                THE COURT:  Mr. Gold, are there any other aspects of

3       the penalties that Mr. Amodeo's facing that you'd like the

4       Court to address?

5                MR. GOLD:  No, except with the one exception on the

6       forfeiture on page 20 at the top.  As to the two particular

7       pieces of real property, those relate to that difference

8       between the 172 and 181 million dollars.  The government's

9       position is that those two properties are forfeitable.

10      Mr. Amodeo's are that they're not if they came from the fees,

11      and that the Court will decide those as well.

12               THE COURT:  Okay.  So that is an issue -- those two

13      pieces of real property described on page 20 remain an issue

14      for the Court to adjudicate in terms of forfeiture?

15               MR. GOLD:  Yes, sir.

16               THE COURT:  And also, in terms of the money

17      judgment, is there a potential range for that money judgment

18      between 172 and 181 million dollars?

19               MR. GOLD:  Yes, sir.

20               THE COURT:  Okay.

21               All right.  Mr. Amodeo, do you have any question

22      about those items that remain for adjudication by the Court?

23               THE DEFENDANT:  No, sir.

24               THE COURT:  You understand that in terms of the

25      property described, it's only those two properties described

1    on page 20 that you retain a right to argue about whether or

2    not it's subject to forfeiture, correct?

3              THE DEFENDANT:  Yes.

4              THE COURT:  And similarly, as set forth on page 10,

5    you understand that in terms of the money judgment that will

6    be entered against you, there's a very limited issue that

7    remains for adjudication, and that is the amount of the money

8    judgment between the range of $172 million and $181.8 million,

9    correct?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Mr. Amodeo, do you feel that you

12   understand all of the penalties that you're facing, if you

13   enter a guilty plea?

14             THE DEFENDANT:  I do.

15             THE COURT:  All right.  Mr. Amodeo, you understand

16   that you're not required to plead guilty, correct?

17             THE DEFENDANT:  Yes.

18             THE COURT:  You have every right to maintain that

19   you're innocent and to require the government to prove beyond

20   a reasonable doubt at trial that you're guilty of each of the

21   crimes alleged, correct?

22             THE DEFENDANT:  Yes.

23             THE COURT:  I want to advise you of certain rights

24   that you'd have at trial, and you would be giving up those

25   rights or waive those rights if you do enter a guilty plea,

58

1   sir.  First, you would have a right to counsel.  If you can't

2   afford counsel, the Court will provide counsel for you at no

3   cost; do you understand, sir?

4          THE DEFENDANT:  I do.

5          THE COURT:  So, you would have counsel represent you

6   at trial, and you would have an adequate opportunity for that

7   counsel to get prepared in order to represent you at trial; do

8   you understand?

9          THE DEFENDANT:  Yes.

10         THE COURT:  All right.  Furthermore, sir, you'd have

11  the right to a 12-person jury.  And the issues of fact, as you

12  alluded to earlier, would be determined by the 12-person jury.

13  In addition, sir, you would have the presumption of innocence.

14  You would not be required to offer any testimony on your own

15  behalf.  It would be the government's burden to prove that

16  you're guilty beyond a reasonable doubt.  You'd the

17  presumption of innocence.  No negative inference could be

18  drawn if you failed to testify; do you understand?

19         THE DEFENDANT:  Yes.

20         THE COURT:  On the other hand, if you wanted to

21  testify on your own behalf, you would have the right to offer

22  testimony on your own behalf; do you understand?

23         THE DEFENDANT:  Yes.

24         THE COURT:  All right.  Sir, you'd also have the

25  right to confront any witnesses called by the government.  By

1    that, I mean that your counsel would have the right to examine

2    any witnesses called by the government through cross

3    examination.  In addition, you'd have the right to object to

4    the introduction of any evidence by the government.  Do you

5    have any questions about that, sir?

6              THE DEFENDANT:  No.

7              THE COURT:  In addition, sir, you would have the

8    right to compulsory process.  And by that, I mean to tell you

9    that if there were witnesses that you thought would offer

10   testimony which would be favorable to your case, the Court

11   would assist you by issuing subpoenas and compelling witnesses

12   to appear before the Court to offer that testimony to help you

13   in defense of your action.  Any questions about that?

14             THE DEFENDANT:  No.

15             THE COURT:  All right.  Sir, you understand that if

16   you do enter a guilty plea, you'll be waiving all of those

17   rights associated with trial that I just explained, correct?

18             THE DEFENDANT:  I do.

19             THE COURT:  The only thing left for the Court to do

20   would be to enter a finding that you are guilty of each of the

21   counts that you're pleading guilty with respect to; do you

22   understand?

23             THE DEFENDANT:  Yes.

24             THE COURT:  There would be no trial whatsoever; do

25   you understand?

1           THE DEFENDANT:  Yes.

2           THE COURT:  And furthermore, you'd be giving up any

3    and all defenses that you would have with respect to the

4    counts that you desire to plead guilty with respect to; do you

5    understand?

6           THE DEFENDANT:  Yes.

7           THE COURT:  All right.  In addition, sir, I want you

8    to understand that if you do enter a guilty plea, you'll be

9    waiving your right against self-incrimination, such that the

10   prosecutor or the Court can ask you detailed questions about

11   the crimes that have been alleged, and you'll be required to

12   answer those questions truthfully; do you understand?

13          THE DEFENDANT:  I do.

14          THE COURT:  If you enter a guilty plea, it would be

15   a waiver of your right to appeal the finding that you are

16   guilty; do you understand?

17          THE DEFENDANT:  I do.

18          THE COURT:  Sir, the one right that you would not

19   give up by entering a guilty plea is your right to assistance

20   of counsel, sir.  You would still have the right to assistance

21   of counsel, and you can have your retained counsel represent

22   you.  But if you need appointed counsel, the Court will

23   appoint counsel for you to represent you in connection with

24   your sentencing.  Any questions about that?

25          THE DEFENDANT:  No, sir.

1              THE COURT:  All right.  Mr. Amodeo, in a moment I'm

2     going to ask the government to summarize the facts that it

3     would intend to prove at trial in order to establish that

4     you're guilty of the charges alleged.  In this particular

5     instance, the factual summary may be fairly lengthy, so I want

6     to make sure that you have a pen and paper in front of you.  I

7     want you to pay close attention to the summary of the facts.

8              If there's anything stated in the summary that you

9     believe is inaccurate in any way or misleading or false, I

10    want you to let us know.  At the conclusion of the summary,

11    I'm going to ask you to let us know of any facts that you

12    believe that have been outlined by the government that are

13    inaccurate, misleading, or false, okay?

14              THE DEFENDANT:  Okay.

15              THE COURT:  All right.  Mr. Gold, would you please

16    summarize the facts.

17              MR. GOLD:  Yes, Your Honor.

18              First of all, they are set forth at pages 26 through

19    36.  There's 11 pages of facts into which Mr. Amodeo and his

20    attorneys had great input.  I don't know if the Court wants me

21    to read them or incorporate them by reference.  I can

22    certainly try and summarize them, but, obviously, this is an

23    extremely complicated case, so I'll be happy to proceed

24    however the Court wishes.

25              THE COURT:  Well, I'm looking at the summary.  It's

1   26 through 36.  It's double spaced.  I would ask you to

2   summarize.  Well, actually, to avoid any error, why don't you

3   go ahead and read them into the record.

4          MR. GOLD:  Okay.

5          All right.  There is the section called

6   Introduction.  This case involves a web of one public and

7   several private companies, including multiple employee leasing

8   companies, also known as professional employee organizations

9   or PEOs.  The responsibilities of the PEOs included, among

10  other duties, the recording and paying over of the payroll

11  wages and payroll taxes of the worksite employees.

12         Amodeo had operated small businesses prior to the

13  time period of the indictment in this case and was aware that

14  once Federal Insurance Contribution Acts or FICA and

15  withholding taxes, trust fund taxes are collected, they are

16  supposed to be held for and paid over to the Internal Revenue

17  Service.  Notwithstanding this knowledge, Amodeo conspired

18  with other members of the conspiracy to divert payroll tax

19  funds paid to the PEOs by the PEO clients and utilize those

20  funds for other purposes.

21         There were a number of companies directly controlled

22  by Amodeo, including the Sunshine Companies, Professional

23  Benefit Solutions, which is PBS, Paradyme, Inc., which is

24  Paradyme, Presidion Solutions, Inc., which is noted as PSI,

25  Quantum Delta Enterprises, Quantum, Wellington Capital Group,

1   Inc. Or Wellington, and AQMI Strategy Corporation or AQMI.

2   Amodeo had varying degrees of control over a number of

3   additional companies involved in the conspiracy, including

4   Mirabilis Ventures, Inc., which will be described as

5   Mirabilis.

6          The second section talks about Mr. Amodeo's purchase

7   of Sunshine Companies from PSI.  PSI is a Michigan-based

8   holding company for several PEOs that during the period from

9   2001 through 2005 provided comprehensive and integrated

10  resource management services, including payroll services, to

11  small and medium-sized companies.  Prior to July of 2005, PSI

12  was a wholly-owned subsidiary of Presidion Corporation, a

13  publicly traded company, which was later de-listed.

14         Amodeo did not become involved with PSI until 2004.

15  Prior to his involvement, PSI had already acquired seven PEOs,

16  which made up PSI's book of business or the contracts PSI had

17  with its PEO clients.  In or about May 2001, PSI acquired

18  Sunshine Staff Leasing, Sunshine Companies I, II, III, and IV,

19  collectively referred to as the Sunshine Companies.

20  Post-acquisition, these entities did business as Presidion

21  Solutions I, II -- it should say III.  It appears there's a

22  typo there, but it's III, IV, and V, respectively.

23         PSI acquired Paradyme in on about January 2002,

24  which subsequently did business as Presidion Solutions VI.

25  PSI then acquired certain PEO customer contracts from BST,

1    Inc. In or about June 2002.  Lastly, PSI acquired PBS in or

2    about January 2005, which subsequently did business as

3    Presidion Solutions VII.  With the acquisitions of the

4    Sunshine Companies, Paradyme and PBS, PSI had at least 2,200

5    clients and approximately 29,700 worksite employees.  The

6    clients of the PEOs entered into contracts or service

7    agreements with PSI or its subsidiaries.

8              Initially, the clients entered into the agreement

9    with the Sunshine Companies, then later on the clients either

10   entered into an agreement with Paradyme or PBS.  According to

11   the contract signed by the clients, when PSI or its

12   subsidiaries started providing services to the client, PSI

13   became the co-employer of its clients' employees and assumed

14   the liabilities and responsibilities for reporting and paying

15   over to the Internal Revenue Service the payroll wages and the

16   payroll taxes of the worksite employees.

17             At the end of a client's payroll cycle, a client

18   would e-mail, fax, or mail the number of hours worked by the

19   worksite employees to PSI.  After receiving the information,

20   PSI computed the amount of FICA, Medicare, withholding taxes,

21   workers compensation insurance, and 401(k) contributions to be

22   added to the client's bill, along with PSI's administrative

23   fee.  PSI would then e-mail, fax, or mail this information

24   back to the clients, who would either direct debit, mail, or

25   wire the funds to PSI.

1          Beginning in July 2004, Amodeo began negotiating

2    with the principals of PSI to assist them in the reduction of

3    their corporate debt, which included unpaid payroll taxes

4    totaling at least $13 million, including interest, penalty,

5    and taxes, which were accrued by the Sunshine Companies.

6          At the time, the parent company of PSI, Presidion

7    Corporation, was preparing for an annual audit.  In an attempt

8    to have Presidion Corporation appear more profitable as a

9    publicly-traded company, PSI wanted the Sunshine Companies'

10   payroll tax liabilities removed from Presidion Corporation's

11   financial statements.

12         To that end, on October 18th, 2004, PSI signed a

13   consulting agreement with Amodeo as the president of AQMI.

14   The consulting agreement called for Amodeo to provide tax

15   advice to PSI for a nonrefundable fee in the amount of

16   $150,000 and an additional fee of 25 percent of any tax

17   savings of the company's current payroll tax liability, which

18   at the time was at least $13 million, including interest,

19   penalties, and taxes.

20         Amodeo's plan was to have Wellington, a corporation

21   he controlled, purchase the Sunshine Companies from PSI, and

22   thereby relieve PSI's financial statements of the Sunshine

23   Companies' accumulated payroll tax liabilities.  On December

24   1, 2004, AQMI provided a line of credit in the amount of

25   approximately $3 million to Wellington.  On December 8, 2004,

1    Amodeo, through Wellington, agreed to purchase the Sunshine

2    Companies for approximately $500,000.

3         During December 2004, PSI transferred approximately

4    $8.9 million to AQMI.  Witnesses for the government who were

5    associated in a management capacity with PSI will testify that

6    they expected Amodeo to use the $8.9 million to remit payments

7    to the Internal Revenue Service in satisfaction of outstanding

8    payroll tax obligations of the Sunshine Companies.

9         Amodeo contends that he and AQMI took the position

10    that for tax purposes all of the funds constituted payment

11    pursuant to the consulting agreement.  Wellington used a

12    portion of the funds received from AQMI to purchase multiple

13    cashier's checks to complete the purchase of the Sunshine

14    Companies.

15         Amodeo's purchase of the Sunshine Companies did not

16    include PSI's book of business, which was transferred to

17    Paradyme, a wholly-owned subsidiary of PSI.  Wellington

18    acquired the Sunshine Companies on or about December 31st,

19    2004, and subsequently dissolved the Sunshine Companies.

20    Since the purchase of the Sunshine Companies by Wellington,

21    Amodeo caused to be paid approximately $3.2 million to the

22    Internal Revenue Service toward the Sunshine Companies'

23    payroll tax liability, which currently totals over $37

24    million, including interest, penalties, and taxes.

25         The third subsection is Amodeo's purchase of PSI,

1    Paradyme, and PBS.  On or about May 18th, 2005, Amodeo was

2    again approached by principals of PSI regarding further

3    problems with the company, including a severe shortage of

4    working capital, other liabilities totaling millions of

5    dollars, and potential cancellation of its workers

6    compensation insurance policy.

7           Amodeo and other members of the conspiracy devised a

8    reorganization strategy for the aggregate PSI book of

9    business.  In or about July 2005, Wellington, at Amodeo's

10   direction, acquired PSI and consequently acquired control of

11   PSI's subsidiaries and remaining PEOs, Paradyme and PBS.

12          Thereafter, between June 2005 and December 2005,

13   Amodeo directed that the payroll taxes collected from the

14   clients not be paid over to the Internal Revenue Service, but

15   instead be used to pay secured creditors, both arm's length

16   third parties and entities Amodeo controlled, critical vendors

17   of PBS and Paradyme, and to purchase commercial and business

18   assets for the benefit of Amodeo and the other

19   co-conspirators.  It was Amodeo's grand plan to not remit the

20   payroll taxes in order to grow Mirabilis to the point that it

21   could become a publicly traded company.  Once that was

22   accomplished, Mirabilis would be able to repay the payroll

23   taxes.

24          Pursuant to this plan, Amodeo directed that funds

25   PBS should have used to pay payroll taxes instead be

1    transferred from a PSI account maintained at Bank of America,

2    which was called the Ultimate Master account, which collected

3    the payroll tax funds from PBS, to a PSI account maintained at

4    First Southern Bank, known as the Reserve account.  The funds

5    were later disbursed from the Reserve account at Amodeo's

6    direction for purposes unrelated to the payment of payroll tax

7    liability to the IRS.

8            From June 10th, 2005 until December 31st, 2005,

9    Amodeo caused to be transferred approximately $64,600,000 to

10   the Reserve account from the Ultimate Master account for the

11   purpose of rehabilitating PSI's book of business, acquiring

12   other businesses and paying operating expenses, which enabled

13   Amodeo, companies he controlled, and other members of the

14   conspiracy to acquire personal assets, such as real estate and

15   automobiles.

16           The fourth section is entitled, Transfer of Paradyme

17   and PBS business to AEM.  In late 2005, negotiations occurred

18   to sell the book of business of Paradyme and PBS to AEM, Inc.,

19   effective January 1st, 2006.  A major purpose of the sale was

20   to shift the apparent responsibility for the payment of the

21   payroll taxes to AEM and its parent company, Mirabilis, a

22   private equity fund, one of the consequences of which was to

23   make it more difficult for the Internal Revenue Service to

24   determine which company was responsible for the payroll taxes.

25           Although the sale was never fully consummated, AEM

1    thereafter had effective operational control over the book of

2    business of Paradyme and PBS.  Mirabilis was originally formed

3    by Amodeo in 2004 to buy distressed businesses, and eventually

4    evolved into a business that specialized in acquisitions of

5    and mergers with other businesses in various industries.

6            By late 2006, Mirabilis had grown to be a

7    conglomerate of approximately 70 companies involved in various

8    industries, including consulting, corporate security, employee

9    leasing, and hotel ownership.  Although Amodeo was never an

10   officer, director, or employee of Mirabilis, he created

11   Mirabilis, brought in the officers to run the company, and

12   funded the company with diverted payroll tax funds that should

13   have been paid over to the Internal Revenue Service.

14           In most instances, Amodeo exercised or attempted to

15   exercise considerable control over both the long term and

16   short term management of the company.  For example, during a

17   March 21st, 2006, Mirabilis board of directors meeting

18   attended by Amodeo, he told the board that they had a

19   fiduciary obligation to him as the company's sole common stock

20   shareholder and senior secured creditor.

21           He recommended various changes to the board of

22   directors that were subsequently implemented by the board.  He

23   laid out recommended changes in the operational procedures

24   that were also implemented by the board and proposed future

25   acquisition strategies, which were to be funded by cash

1    infusions, which he would supply.

2         The cash infusions made by Amodeo were derived from

3    payroll tax funds.  Mirabilis used these funds to fund

4    acquisitions of other businesses, pay substantial salaries,

5    and make investments in businesses, in which certain members

6    of the conspiracy held separate interests.

7         In connection with the anticipated January 2006

8    purchase by AEM of the Paradyme and PBS book of business, a

9    member of the conspiracy signed a hold harmless agreement on

10   behalf of PSI promising to pay Mirabilis $50 million by

11   December 31st, 2005 in return for Mirabilis' agreement to hold

12   PSI harmless for any subsequent claims against the company, up

13   to a maximum of $70 million.

14        This obligation effectively diverted to Mirabilis

15   $50 million of funds owed to the Internal Revenue Service,

16   with the additional advantage of creating a $70 million debt

17   owed by Mirabilis that could be used in negotiating with the

18   Internal Revenue Service for deferment of the payment of the

19   rapidly escalating unpaid trust fund taxes.

20        This was part of and consistent with Amodeo's

21   overall plan of circumventing the Internal Revenue Service's

22   immediate collection of accrued trust fund tax obligations by

23   transferring collected trust fund taxes from corporation to

24   corporation and concomitantly creating offsetting

25   intercorporate liabilities that were used to justify

1    nonpayment and to create leverage in ongoing negotiations with

2    the Internal Revenue Service.

3              In or about January 2006, Amodeo requested that a

4    legal memorandum be prepared by the outside law firm of

5    general counsel for Mirabilis on the law applicable to the

6    reporting and payment of payroll taxes to the Internal Revenue

7    Service.

8              On February 2nd of 2006, a final version of the

9    memorandum was submitted to Amodeo regarding the relationship

10   between current trust fund obligations after acquired funds

11   and willfulness under Internal Revenue Code, Section 6672.

12   The memorandum described in detail the legal obligation to

13   hold payroll taxes for the Internal Revenue Service and

14   specified civil and criminal penalties, including criminal

15   penalties under Section 7202, for failure to follow the

16   applicable law.

17             Amodeo knew that the memorandum had, in fact, been

18   completed and admits that he had received it, but it is his

19   position that he never read it and never requested that anyone

20   summarize its contents to him.  He submitted the memorandum,

21   still allegedly unread by him, to the general counsel for

22   Mirabilis immediately upon receiving it and directed that a

23   copy be provided to the Mirabilis board of directors.  Amodeo

24   also personally delivered a copy of the memorandum to the

25   Internal Revenue Service in July 2006.

1          Although Amodeo is a former attorney and experienced

2   with debtor-creditor law, in failing to read the memorandum or

3   inquire further into its contents, Amodeo deliberately and

4   consciously tried to avoid learning what specific statutes

5   prohibited his conduct and deliberately closed his eyes to

6   what he had every reason to believe was the fact, that is,

7   that he was legally prohibited from permitting collected trust

8   fund taxes to be used for any purpose other than the

9   transmission in due course to the Internal Revenue Service.

10          Consequently, Amodeo accepts full responsibility for

11   intentionally and willfully violating 26 United States Code --

12   the section should be a symbol, rather than a section -- 7202

13   by failing to remit payroll taxes collected by PBS to the

14   Internal Revenue Service during quarterly periods in 2006 in

15   which Amodeo was in control of PBS, including the first,

16   second, and fourth quarters of 2006 referred to in Counts 7,

17   8, and 10 of the indictment.

18          The next section is entitled, Use of AEM to

19   missappropriate PBS' payroll taxes.  During 2006, members of

20   the conspiracy used AEM to misappropriate PBS' payroll taxes.

21   During the 2006 year, the funds intended to pay the payroll

22   taxes for PBS were held in a Bank of America account in the

23   name of AEM, along with funds to pay the payroll taxes for

24   AEM, which had its own minuscule book of business.

25          Instead of paying the payroll taxes for PBS, Amodeo

1    and members of the conspiracy directed that funds be

2    transferred from the AEM Bank of America account to an account

3    at SunTrust Bank in the name of PSI, which was known as the

4    Capital account.  During 2006, approximately $23,750,000 was

5    transferred from the AEM Bank of America account to the

6    SunTrust Capital account.  After the funds were transferred to

7    the Capital account, the funds were used by Amodeo and members

8    of the conspiracy to purchase, fund, and grow additional

9    businesses.

10           In addition to the funds transferred to the Capital

11   account during 2006, funds were also directly transferred from

12   the AEM Bank of America account to companies controlled by

13   Amodeo and members of the conspiracy, such as Common Paymaster

14   Corporation, Nexia Strategy Corporation, and Mirabilis to fund

15   the companies' operations and to acquire other companies.  In

16   December 2006, after the receipt of the grand jury subpoenas,

17   Amodeo knowingly permitted payroll taxes collected on a daily

18   basis from the PEO book of business to be used to fund net

19   payroll and health claims of Mirabilis and its affiliates.

20           Subsection 6 is entitled Total unpaid payroll taxes.

21   It is the position of the government that Amodeo and other

22   members of the conspiracy knowingly failed to remit to the

23   Internal Revenue Service payroll taxes totaling in excess of

24   $181 million.  However, Amodeo believes that the figure is no

25   higher than $172 million.  The exact amount will be determined

1    by the Court at sentencing.

2          That last section, subsection 7, is Obstruction of

3    an agency investigation.  Commencing in early 2005, Amodeo and

4    others were in contact with the Internal Revenue Service

5    concerning the Sunshine Companies' tax liabilities, but

6    withheld information about PBS' tax liabilities from the

7    Internal Revenue Service until February 2006, by means that

8    included the late filing of Forms 941 at which time PBS'

9    payroll tax liabilities exceeded $100 million.

10          On or about June 26, 2006, a co-conspirator advised

11    an Internal Revenue Service officer that payroll tax money not

12    paid to the Internal Revenue Service was used to purchase two

13    other companies when, in fact, the money was used to purchase,

14    among other things, several companies, cars, a plane, and real

15    estate.

16          On or about August 29, 2006, Amodeo and members of

17    the conspiracy met to conduct a mock deposition of Amodeo to

18    prepare him for a meeting with Internal Revenue Service

19    revenue officers.  During a recess in the mock deposition,

20    Amodeo was advised by a co-conspirator that his account might

21    expose them to prosecution for federal offenses.

22          As a result of that conversation, Amodeo

23    subsequently changed his account to conceal material aspects

24    of their activity.  This revised version of his account was

25    communicated to Internal Revenue Service representatives by

1    one or more members of the conspiracy at Amodeo's direction in

2    an attempt to obstruct and impede the Internal Revenue

3    Service's investigation of PBS.

4              THE COURT:   Thank you.

5              If we could just correct that one Roman numeral with

6    respect to the Presidion Solutions I, II, and III --

7              MR. GOLD:   That's fine.

8              THE COURT:   -- and follow the same procedure that we

9    did earlier in terms of interlineating the change and having

10   both sides review it and initial it --

11             MR. GOLD:   That's fine.

12             THE COURT:   -- and then, I'll proceed to ask

13   Mr. Amodeo questions about the factual summary.

14             (Pause in proceedings.)

15             MR. GOLD:   It has been done, Your Honor.

16             THE COURT:   All right, thank you.

17             Mr. Amodeo, you listened to and paid attention to

18   the summary of the facts provided by Mr. Gold, correct?

19             THE DEFENDANT:   I did.

20             THE COURT:   All right.   And did you have an

21   opportunity to make notes regarding any inaccuracies or

22   misleading statements that you found in the summary provided

23   by Mr. Gold?

24             THE DEFENDANT:   I did.

25             THE COURT:   All right.   And other than the one Roman

1   numeral being changed, which we've already addressed, was

2   there anything in the factual summary provided by Mr. Gold

3   that you believe is inaccurate, incorrect, or misleading in

4   any way, sir?

5            THE DEFENDANT:  There was not.

6            THE COURT:  All right.  Now, you are familiar with

7   the events surrounding the companies' activities that were

8   just summarized by Mr. Gold, correct?

9            THE DEFENDANT:  I am.

10           THE COURT:  Do you have a clear recollection of

11  those events?

12           THE DEFENDANT:  I do.

13           THE COURT:  And all statements in terms of your

14  actions and your intent at the times you acted are true and

15  accurate, are they?

16           THE DEFENDANT:  Yes.

17           THE COURT:  Sir, if you would, please turn to page

18  24 of the plea agreement under Section B.6.  There's a

19  provision in there titled Middle District of Florida

20  Agreement.  Have you reviewed that paragraph, sir?

21           THE DEFENDANT:  I'm sorry, Your Honor.

22           THE COURT:  That's all right.  It's on page 24, sir.

23           THE DEFENDANT:  Yes.

24           THE COURT:  Under Section B, subparagraph 6.  Do you

25  see the section?

1                    THE DEFENDANT:  I do.

2                    THE COURT:  All right.  Have you reviewed that

3    section, sir?

4                    THE DEFENDANT:  Yes.

5                    THE COURT:  You understand that that section means

6    that the agreement that you've entered into in this plea

7    agreement is only binding on the United States Attorney's

8    Office for the Middle District of Florida, correct?

9                    THE DEFENDANT:  Yes.

10                    THE COURT:  It's not binding on any other

11   governmental agency, state or federal, correct?

12                    THE DEFENDANT:  Yes.

13                    THE COURT:  Sir, in your own words, what is it that

14   you did that may make you guilty of Count 1, the conspiracy

15   count, sir?

16                    THE DEFENDANT:  I agreed to transfer funds that came

17   from unpaid payroll taxes.

18                    THE COURT:  And you knew that those funds should

19   have been paid to the government?

20                    THE DEFENDANT:  Yes, sir.

21                    THE COURT:  You knew that they were payroll tax

22   funds?

23                    THE DEFENDANT:  I did.

24                    THE COURT:  All right.  And you did that

25   voluntarily, did you, sir?

1              THE DEFENDANT:  Yes.

2              THE COURT:  No one threatened you or coerced you in

3    any way to do that, sir, did they?

4              THE DEFENDANT:  No.

5              THE COURT:  All right.  Similarly, with respect to

6    Count 2 -- well, I'm sorry, with respect to Counts 7, 8, and

7    10, which allege failure to collect and remit payroll taxes,

8    again, sir, what is it that you did in your own words that may

9    make you guilty of those counts, sir?

10             THE DEFENDANT:  I was the owner of a company, which

11   owned a PEO, that allowed a third party to collect the payroll

12   taxes, and I had asked for a memorandum to make sure it was

13   okay to use that money to pay other things.  I chose not to

14   read the memorandum when it came in, because I was concerned

15   about the conclusions the memorandum might arrive at.

16   Therefore, I violated a duty to make sure the payroll taxes

17   were paid.

18             THE COURT:  You knew that you had that duty, sir?

19             THE DEFENDANT:  Yes.

20             THE COURT:  Okay.  And you willfully violated that

21   duty, did you?

22             THE DEFENDANT:  Yes.

23             THE COURT:  And, again, that's something that you

24   did voluntarily without anyone forcing you to do it, sir?

25             THE DEFENDANT:  Yes.

1              THE COURT:  Similarly, with respect to Count 27 that

2    alleges obstruction of agency proceedings, sir, in your own

3    words, what conduct is it that you engaged in that may make

4    you guilty of that, sir?

5              THE DEFENDANT:  I permitted, in fact, instructed the

6    accountants who were dealing with the IRS to change the way

7    that they presented the history of events from Presidion as a

8    result of the advice that was given during the mock

9    deposition, and that would have made it more difficult for the

10   IRS to determine who owed the taxes in the end of 2006.

11             THE COURT:  And again, that's something that you did

12   knowingly and intentionally, sir?

13             THE DEFENDANT:  Yes.

14             THE COURT:  And you did that with the intent of

15   making it difficult for the IRS to understand what had

16   actually transpired?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Sir, do you want to plead guilty,

19   because you are guilty or is there some other reason?

20             THE DEFENDANT:  Because I am guilty, Your Honor.

21             THE COURT:  All right.  Based on your testimony and,

22   again, with respect to competency of the testimony of

23   Mr. Danziger, I find that you are competent to enter a guilty

24   plea, that you understand the consequences of entering a

25   guilty plea.  And based on your testimony, sir, there is a

1    factual basis for you to enter a guilty plea.  As I said, you

2    know, there are various phases, and we're getting to the last

3    phase where I ask you how you plead.  Is there anything that

4    you want to ask your counsel or tell your counsel or the Court

5    that may bear on your decision in terms of whether or not to

6    plead guilty, sir?

7              THE DEFENDANT:  No.

8              THE COURT:  Do you want to add to, change, or modify

9    your testimony before this Court here today in any way before

10   I ask you how you plead, sir?

11             THE DEFENDANT:  No.

12             THE COURT:  During the course of the proceedings

13   today, sir, have you had any difficulty understanding what's

14   been said by any participant?

15             THE DEFENDANT:  No, Your Honor.

16             THE COURT:  Do you feel that you have a clear

17   understanding of the decision that you're about to make and

18   the consequences of that decision, sir?

19             THE DEFENDANT:  I do.

20             THE COURT:  Sir, then, I'm going to ask you how do

21   you plead with respect to Counts 1, 7, 8, 10, and 27 of the

22   indictment, sir?

23             THE DEFENDANT:  Guilty.

24             THE COURT:  You plead guilty to each and every

25   count, sir?

1              THE DEFENDANT:  Yes, sir.

2              THE COURT:  All right.  Are you doing that freely

3    and voluntarily without any coercion or intimidation, sir?

4              THE DEFENDANT:  I am.

5              THE COURT:  Counsel for the parties, are you aware

6    of any legal reason why the Court should not enter a report

7    and recommendation to the district court judge that

8    Mr. Amodeo's desire to enter a guilty plea be accepted?

9              MR. GOLD:  No, sir.

10             MR. SLAUGHTER:  No, Your Honor.

11             THE COURT:  Do you want to add anything further for

12   the record at this point and time?

13             THE DEFENDANT:  No, Your Honor.

14             COUNSEL:  No, Your Honor.

15             THE COURT:  All right.  Sir, I find that your guilty

16   plea is made competently, it's made freely, knowingly,

17   intelligently, and voluntarily, it's also supported by a

18   proper factual basis on your desire to enter a guilty plea is

19   not the result of any force, threats, coercion, or promises

20   whatsoever, except those promises expressly set forth in the

21   plea agreement, therefore, I'm going enter a report and

22   recommendation to the district judge that your desire to enter

23   a guilty plea be accepted.

24             Mr. Slaughter, you've indicated that if this was the

25   outcome of the hearing today, that you would remain in the

1  case?

2        MR. SLAUGHTER:  I remain in the case, and we'll

3  probably bring in additional counsel.

4        THE COURT:  Okay, for sentencing?

5        MR. SLAUGHTER:  Yes, sir.

6        THE COURT:  Okay, very well.  If you'd have them

7  file a notice of appearance, I'd appreciate that.

8        MR. SLAUGHTER:  Okay.

9        THE COURT:  All pending motions will be denied, and

10  that would include your motion to continue your appearance on

11  a limited basis, Mr. Slaughter, okay, so you've now made a

12  general appearance, okay?

13        MR. SLAUGHTER:  Yes.

14        THE COURT:  All right.

15        Very well, anything further?

16        MR. GOLD:  No, Your Honor.  Thank you again for your

17  accommodation for the parties.

18        MR. SLAUGHTER:  Thank you, Your Honor, for your

19  accommodation.

20        THE COURT:  All right.

21        (Hearing concluded at 12:00 p.m.)

22                  _ _ _ _ _ _ _

23

24

25

```
 1                        CERTIFICATE

 2   I HEREBY CERTIFY THAT THE FOREGOING IS AN ACCURATE

 3   TRANSCRIPTION OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

 4   Koretta Stanford        9-30-08
     _____
 5   Koretta Stanford           Date
     Official Court Reporter
 6   (407) 872-1715

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```