UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,


vs.                          Case No. 6:08-CR-176-ORL028GJK


FRANK L. AMODEO,


                    Defendant.

------------------------------------------------------------

**September 22, 2008**

**Transcript of Proceedings**
**ARRAIGNMENT AND MISCELLANEOUS HEARING**


**Before The Honorable GREGORY J. KELLY**
**United States Magistrate Judge**

APPEARANCES:

For the Plaintiff:     Randy Gold
                       Assistant U.S. Attorney
                       501 W. Church Street, Suite 300
                       Orlando, FL  32805

For the Defendant:     Harrison Slaughter
                       111 S. Orange Avenue
                       Orlando, FL  32801




Proceedings recorded by AUDIOTAPE, transcript produced with
computer-aided transcription.

```
1                        P R O C E E D I N G S

2                  (CASE CALLED.)

3                  THE DEPUTY CLERK:  Counsel, please state your

4      appearances for the record.

5                  MR. GOLD:  Good afternoon, Your Honor.  On behalf

6      of the United States, Randy Gold.  Seated with me is IRS

7      Special Agent Richard Smith.

8                  THE COURT:  Good afternoon.

9                  MR. SLAUGHTER:  Good afternoon, Your Honor.

10     Harrison Slaughter.  Sitting next to me is Frank Amodeo, the

11     defendant.

12                 THE COURT:  Good afternoon.  We have an

13     arraignment this afternoon.  Mr. Slaughter, does your client

14     wish to have a formal reading of the indictment or would he

15     waive?

16                 MR. SLAUGHTER:  He would waive it.

17                 THE COURT:  All right.  And in terms of a plea?

18                 MR. SLAUGHTER:  At this point in time, not

19     guilty.

20                 THE COURT:  All right.  In light of that we'll go

21     ahead and enter a scheduling order.  The status conference

22     will be set for October 17 at 9:15 in the morning in

23     courtroom 6B.  The case will be scheduled for trial during

24     the two week trial period commencing November 3, 2008 at 9:15

25     a.m.
```

1          MR. GOLD:  Your Honor, there was a plea agreement

2     that was filed with the court today.

3          THE COURT:  I'm aware of it.

4          MR. GOLD:  So I'm assuming that we will do it

5     well before that timeframe.

6          THE COURT:  Okay.  In terms of competency, there

7     was an issue of competency raised at the last hearing before

8     the court, but in the motion for continuance I noticed that

9     the assertion was made that the defendant is competent to

10     stand trial and that was an unopposed motion, so I'm taking

11     it that the parties agree that Mr. Amodeo is competent to

12     stand trial.  Is that correct?

13          MR. SLAUGHTER:  Yes, Your Honor.

14          MR. GOLD:  Yes, Your Honor.

15          MR. SLAUGHTER:  We have Dr. Danziger here if you

16     want to take some quick testimony from him who saw him on

17     September 2, last Friday, and then again today.

18          THE COURT:  Okay.  Well, I'll leave that to you.

19     I mean both parties seem to be in agreement that Mr. Amodeo

20     is competent to stand trial and that would be sufficient for

21     my purposes unless you want testimony of record.  And that's

22     fine if you do.  I'll be happy to --

23          MR. SLAUGHTER:  I can put him on in five minutes.

24          THE COURT:  Sure.  If you want to make that

25     record, go ahead.

```
 1                    MR. SLAUGHTER:  Your Honor, can I hand up to the
 2       court his curriculum vitae?
 3                    THE COURT:  Sure.  Thank you.
 4       Whereupon:
 5                    JEFFREY A. DANZIGER,
 6       called as a witness, having been first duly sworn according
 7       to law, testified as follows:
 8                    THE DEPUTY CLERK:  State your name for the
 9       record.
10                    THE WITNESS:  Jeffrey A. Danziger, D A N Z I G E
11       R.
12                          DIRECT EXAMINATION
13       BY MR. SLAUGHTER:
14       Q.    Dr. Danziger, as quickly as you can without losing any
15       continuity in what you're going to say, would you tell the
16       court what you do for a living?
17       A.    I am a psychiatrist, Your Honor.
18       Q.    And do you have any specialties?
19       A.    Yes.  In addition to my general psychiatry boards, I
20       am board certified in forensic psychiatry, addiction
21       psychiatry, and geriatric psychiatry.  I maintain an office
22       practice in Maitland, Florida.  I spend about a quarter of my
23       time doing psychiatric research, mostly with new medications
24       not yet available on the market, and about half my time is
25       spent doing forensic psychiatry in a variety of civil and
```

1    criminal settings.  Over the past 20 years I've done perhaps

2    four or five thousand competency, slash, sanity evaluations

3    for state and federal courts.

4    Q.    And just briefly, would you tell the court where you

5    went to school?

6    A.    I did my undergraduate at Harvard College, graduating

7    in 1978 with a bachelor's degree in biology.

8    Q.    Any honors?

9    A.    Yes.  I graduated magna cum laude.  I then attended

10    the University of Miami School of Medicine, graduating with

11    my MD in 1982.  And then did my internship and residency in

12    the field of psychiatry at Washington University, St. Louis.

13    And after completing my residency and spending one year on

14    the faculty there, I've been in the Central Florida area for

15    the past 21 years.

16    Q.    Have you written on the subject of bipolarism or

17    depression?

18    A.    I've not actually published articles on them, but I

19    certainly have done research studies in the field and have

20    treated well over a thousand patients with bipolar disorder.

21    Q.    And could you tell the court when you first met Mr.

22    Amodeo and what you were asked to do and what you've done

23    since then?

24    A.    I first met Mr. Amodeo on August 20, 2007, and that

25    was at your request, Mr. Slaughter.  You expressed your

1    concern to me that Mr. Amodeo was expressing various

2    delusional beliefs, that his mood was entirely unstable, that

3    he was frequently irrational, and you asked for a psychiatric

4    evaluation given the complexities of the present case.

5              I've actually seen Mr. Amodeo on at least half a

6    dozen formal occasions.  Those were August 20 of 2007, August

7    29 of 2007, September 10, 2007, May 12 of 2008, and then most

8    recently on September 3 of '08, and just four days ago,

9    September 18, 2008.

10              In addition to seeing him I reviewed a great deal

11    of collateral information, various videotapes as well as

12    documents from Mirabilis.  I spent well over an hour talking

13    to his wife, Claire, who provided helpful collateral

14    information.  I had actually referred him to one of my

15    colleagues for treatment, a Dr. Krotenburg, and spoke with

16    him.  And also more recently, Mr. Amodeo had been sent to the

17    McLean Hospital, Harvard's main psychiatric teaching

18    hospital, and I spoke with the staff there and reviewed those

19    records.

20              When I met with Mr. Amodeo in May of 2008, I

21    expressed the opinion at that time that he was not competent

22    to proceed.  There was no question that Mr. Amodeo had a

23    factual understanding of the workings of the court.  He

24    certainly understood that his lawyer was supposed to defend

25    him, the nature of the charges that he was facing, the roles

1    of the judge and prosecutor, the factual understanding was

2    not the issue.  Rather, my concern in May of 2008 was that

3    Mr. Amodeo was so delusional that it affected his ability to

4    rationally work within the legal process.

5         His belief was that it was his destiny to become

6    emperor of the world, establish the Terran empire, and

7    because of his belief in natural powers that he could

8    foretell the future, his opinion was that Mr. Gold, the IRS,

9    the charges against him, would all wither away and nothing

10   would impede his march to world domination.  As such, he was

11   disregarding the advice of his attorneys and doing things

12   that were making it very difficult for Mr. Slaughter and his

13   team.

14        I opined at that time that he was not competent

15   to stand trial.  Concomitant with that, Mr. Amodeo was

16   supposed to be receiving treatment from my colleague, Dr.

17   Krotenburg.  I did not wish to be in both the forensic and

18   treatment role, so I referred him to a colleague.  However,

19   Mr. Amodeo was not taking his medications and he was not

20   compliant with follow-up.

21        At that point I spoke to his attorney, Mr.

22   Slaughter, and said the best thing to do at this point would

23   be to send him to an academic medical center, and there were

24   two purposes for that.  The first is since he was

25   non-compliant to out-patient treatment, the only way that I

1    opined to get him better was to send him to a hospital.  In

2    addition, given the magnitude of this case, it was reasonable

3    that there was some skepticism about my diagnosis.  While I

4    opine that he truly did have a major psychiatric illness,

5    bipolar disorder mania with psychiatric features, it's fair

6    to say that others were skeptical and suspected it might be

7    malingering and an attempt to evade prosecution.

8          So in addition to sending him to an academic

9    medical center for treatment, the idea was two weeks of

10   observation, psychological testing, and that way do they

11   agree with me or do they think there was exaggeration and

12   this was all essentially some sort of scam.

13         Mr. Amodeo spent at least two weeks up at McLean

14   Hospital.  He was seen not only by the psychiatrist there but

15   for intensive psychological testing.  The opinion of the team

16   there was that he truly was psychiatrically ill, they agreed

17   with my diagnosis, and in addition, he was started on

18   medications there, Depacoat for mood stabilization and

19   Geodon, a anti-psychiatric medication.

20         The net result was that Mr. Amodeo was improved.

21   Now, he was not well.  He continues to believe that

22   ultimately, despite these current road blocks and speed bumps

23   in his way, that he will become emperor of the world and that

24   his plans to have economic domination of the planet will

25   eventually take place.  However, despite these delusional

1    beliefs, with regard to the issue of competency, it is my

2    opinion that he is competent to proceed.

3              Certainly he has a factual understanding of the

4    legal process.  He knows exactly what the charges against him

5    are.  When I spoke to him about the plea agreement, he

6    understands that it will be up to the judge's discretion with

7    regard to his sentencing.  He could receive up to 15 years --

8    Q.    25.

9    A.    25.  He hopes that it will be closer to five, but he

10   understands that it could be ten or potentially more.  He

11   understands quite factually and rationally that he is looking

12   at a significant period of time in federal prison.  He

13   clearly factually understand the roles of the various

14   officers of the court, but more importantly rationally

15   understands them.

16             He knows that Mr. Slaughter is working on his

17   behalf.  He has agreed to accept the advice of Mr. Slaughter

18   with this plea bargain.  He knows that if he rejects the plea

19   bargain and the case goes to court for a trial and

20   sentencing, well, he might end up with a better outcome, but

21   could potentially end up with a much worse outcome.

22             His ability to work with his attorney in my

23   opinion is not directly influenced by his delusional beliefs.

24   He would be able to testify in a relevant fashion and behave

25   appropriately within the courtroom.

1          Overall it was my opinion that while he remains

2    ill, he is partially improved from where he was in May of

3    2008, and he is partially improved as a result of the

4    treatment he received at the McLean Hospital.

5          And again, I saw him twice this month, not only

6    on September 3, but I saw him just four days ago because I

7    wanted to be sure before he signed that plea that in my

8    opinion he was competent to proceed.

9          The bottom line, Your Honor, is that in my

10   opinion he does suffer from bipolar disorder mania with

11   psychiatric features, but given the partial but significant

12   improvement, he does meet the Dusky standard and is competent

13   to proceed.

14   Q.    When he went up to Harvard McLean Hospital, was it his

15   intent to get better?

16   A.    Yes, it was.  Mr. Amodeo went there voluntarily.  He

17   accepted my recommendation and the recommendations of his

18   attorney to accept treatment with a goal of getting better

19   and having a further diagnostic evaluation.

20   Q.    Did you have any conversations with a Bernard Katz who

21   is a forensic psychiatrist; and who does Dr. Katz work with

22   at Harvard?

23   A.    Dr. Katz is a forensic psychiatrist with the Harvard

24   Longview program which is another one of Harvard's

25   psychiatric divisions.  Dr. Katz works with Dr. Thomas

1    Gutheil, G U T H E I L, who is one of the foremost forensic

2    psychiatrists in America.  I spoke with Dr. Gutheil and asked

3    if he or his team could see Mr. Amodeo, again, for a second

4    opinion, given the magnitude of this matter.

5              Dr. Katz visited with Mr. Amodeo while he was at

6    the McLean Hospital, which is in Belmont, Massachusetts, and

7    Dr. Katz saw him after he had received treatment and

8    medications from the McLean Hospital team.  Dr. Katz reached

9    the opinion in late August of 2008 that while Mr. Amodeo

10   still expressed delusional beliefs, he was now competent to

11   proceed.

12             So essentially, viewing competency as a fluid

13   state rather than a fixed one, my opinion was that he was not

14   competent in May of 2008, he received treatment at McLean,

15   and both Dr. Katz in Boston and myself down here in Orlando

16   are now of the opinion that he is competent.

17   Q.    Does he meet the federal standard for competency to

18   stand trial in your opinion?

19   A.    It is my opinion that he does.

20             MR. SLAUGHTER:  No more questions, Your Honor.

21             THE COURT:  Cross.

22             MR. GOLD:  I have no questions, Your Honor.

23             THE COURT:  You're excused.  Thank you.

24             THE WITNESS:  Thank you, Your Honor.

25             MR. SLAUGHTER:  Thank you, Your Honor.

1          THE COURT:  Mr. Slaughter, I just want to note

2    that I also reviewed the docket and saw that you had filed an

3    unopposed motion to continue your appearance on a limited

4    basis through the competency hearing and in regard to any

5    proceeding with respect to the change of plea.

6          MR. SLAUGHTER:  Your Honor, he is trying to work

7    out arrangements for an attorney to come in and help him for

8    the sentencing.  Our concern was if for whatever reason the

9    court didn't accept the plea, then he would need a public

10   defender to go to trial.

11         THE COURT:  Okay.  Well, Mr. Slaughter, it's my

12   view that it's important for Mr. Amodeo to have counsel on a

13   continuing basis, regardless of what happens in terms of the

14   plea.  I will enter an order, but I will give you 24 hours

15   from now to decide whether you're going to remain in the case

16   or whether you want to withdraw.  If you do want to withdraw,

17   go ahead and file a motion for withdrawal, and we would need

18   a financial affidavit from Mr. Amodeo to determine whether or

19   not he meets the requirements for court appointed counsel.

20         In that regard, to the extent that Mr. Amodeo has

21   assets, would the government be seeking forfeiture of those

22   assets?

23         MR. GOLD:  Yes, Your Honor.  And in the plea

24   agreement there is a very lengthy section the asset

25   forfeiture provisions.  I rather doubt that by the time he

1    got done with the asset forfeiture that he would really have

2    any assets remaining.

3            THE COURT:  All right.  So Mr. Slaughter, 24

4    hours from today, if you do not want to remain in this case

5    on a general appearance basis, you need to file your motion

6    to withdraw by that time.

7            MR. SLAUGHTER:  There may be a substitution of

8    counsel.

9            THE COURT:  Okay.  So if he retains alternate

10   counsel, they can make an appearance in the case.  If that

11   can be arranged by tomorrow afternoon at 2:30 in the

12   afternoon, that would be appreciated, and then we wouldn't

13   have to go through the process of appointing counsel.

14           MR. SLAUGHTER:  Your Honor, one other issue.  Mr.

15   Amodeo's father who appeared before you, as he may have told

16   you, does not have a stomach, and if water goes down his

17   throat, it goes right into his lungs.  Well, the other day

18   that happened and Mr. Amodeo couldn't leave his house because

19   of the restrictions set by the court.  We were wondering if,

20   I don't think Mr. Gold or Miss Wiebe have any objections to

21   you, number one, allowing him maybe to go to the gym to work

22   out, which is like three miles from his house, and going to

23   his parents' house.

24           He's been compliant, he's been taking his

25   medications.  He's been coming to my office every day.  And

1     yesterday we had to go to his condo because we didn't think

2     the GPS was working.  So we went to his office to work or his

3     condo.  Is there any way we could extend where he could go to

4     check on his elderly parents -- his mother's had a bad stroke

5     and his father's got this problem -- without having to call

6     Miss Wiebe first?

7             THE COURT:  All right.  In terms of pretrial

8     services, what's their view in regard to this?

9             PRETRIAL SERVICES OFFICER:  Your Honor, Mr.

10    Amodeo is currently on lock down.  He can only leave with

11    prior knowledge to us and we've instructed him that he must

12    provide us with 48 hours of advance notice to schedule

13    leaving his residence.  That doesn't always occur because of

14    the nature of the case, having to meet with the attorneys and

15    we try to meet with him.  He actually called at 10:35 last

16    night and left me a message about the meeting this morning at

17    9:30 with the prosecutor, and we were able to schedule the

18    time for that.

19            If the court is inclined to make some changes,

20    there are options.  He could be on strict curfew and be

21    allowed to leave from a set time to a set time, or the home

22    incarceration could be not as stringent where he would be

23    allowed to leave for other activities, but still it would

24    have to be set in advance or we would have to give him a

25    daily schedule.

1          THE COURT:  Okay.  So the principal concern here,

2     Mr. Slaughter, is that Mr. Amodeo would like to have the

3     liberty to check in on his parents?

4          MR. SLAUGHTER:  Correct.  And maybe go to the

5     gym.  Right now he comes to our office and he goes back to

6     his condo and I think one of the things they want him to do

7     with taking these drugs is also work out and get some

8     exercise, because he's gained about 40 pounds since he went

9     to Harvard because of these drugs.

10          THE COURT:  All right.  In terms of checking in

11     with his parents, it seems to me that that's something that

12     could be scheduled in advance every day, 10:00 a.m. or

13     something like that, a trip to his parents' house and then

14     returning.  Really, I do, as I expressed before, have some

15     concern about risk of flight and that's the only modification

16     I'm going to make to his restrictions.

17          In terms of if it's medically necessary, if

18     that's the argument, Mr. Slaughter, if there's medical

19     evidence to support that it's medically necessary for him to

20     have a regular workout routine, I would be willing to hear

21     from a professional about it.  But in terms of whether, you

22     know, if it's just a desire to exercise, I'm not inclined to

23     grant that.

24          So Mr. Slaughter, just so we're clear, you will

25     file a motion to withdraw as counsel by 2:30 tomorrow

1    afternoon, otherwise your appearance will be a general

2    appearance?

3               MR. SLAUGHTER:  Or we may have a substitution of

4    counsel.

5               THE COURT:  That's fine.  That would be, the

6    withdrawal would be part and parcel of the substitution,

7    that's fine.

8               MR. SLAUGHTER:  Thank you.

9               MR. GOLD:  Your Honor, do we have any idea

10   approximately when the plea might be scheduled, the actual

11   hearing?

12              (DISCUSSION OFF THE RECORD.)

13              THE COURT:  So it will be later this week or

14   early next week.  I'm sorry I don't have a precise date and

15   time.

16              MR. GOLD:  That's okay.  We're trying to get some

17   sense of whether it would be now or closer to the time of

18   trial.  Obviously the quicker we can do it, the better.

19              THE COURT:  Okay.  So if you could have it --

20   November 3.  If you could have it later this week or early

21   next week, that would be fine?

22              MR. GOLD:  Yes, Your Honor.

23              THE COURT:  Okay.  Since there is possibly going

24   to be a substitution of counsel, is that going to impact the

25   scheduling at all of the change of plea?

1          MR. SLAUGHTER:  Not if it's the one we're

2     thinking of.

3          MR. GOLD:  I don't believe it will.

4          THE COURT:  All right.  Well, maybe we'll

5     schedule it early next week just so that if there is going to

6     be a substitution of counsel, there's an adequate opportunity

7     for counsel to meet with Mr. Amodeo and confer with him about

8     the proceedings.

9          MR. SLAUGHTER:  Yes, Your Honor.  The person that

10    we've been talking about substitution has been at every one

11    of these meetings and helped with the plea agreement for the

12    last three weeks, so he's very familiar with the case.

13         THE COURT:  Fully up to speed then in regard to

14    any change of plea?

15         MR. SLAUGHTER:  I believe he is, Your Honor.

16         THE COURT:  All right.  So nobody believes that

17    it would be necessary to schedule it next week rather than

18    this week?

19         MR. GOLD:  No, Your Honor.

20         THE COURT:  Is that right, Mr. Slaughter?

21         MR. SLAUGHTER:  Unless more time is needed for

22    the financials, that would be the only thing that would hold

23    it up, and we could advise the court in terms of that.

24         THE COURT:  You means in terms of the

25    arrangements for substitution of counsel?

—18—

1              MR. SLAUGHTER:  Or the person to be paid by Mr.

2    Amodeo's father.

3              THE COURT:  Well, he needs to move quickly,

4    exactly.

5              MR. SLAUGHTER:  Move fast.

6              THE COURT:  All right.  Thank you.

7              MR. SLAUGHTER:  Thank you, Your Honor.

8              (BRIEF PAUSE.)

9              (CASE CALLED.)

10              THE DEPUTY CLERK:  Counsel, please state your

11    appearances for the record.

12              MR. GOLD:  Randy Gold on behalf of the United

13    States, Your Honor.

14              MR. SLAUGHTER:  Harrison Slaughter on behalf of

15    Frank Amodeo.

16              THE COURT:  All right.  I understand that you

17    have a scheduling issue that you want to address?

18              MR. GOLD:  If we could.  I guess I can go first

19    if the court wants.  We've spent probably the last two years

20    getting to the point where we are today, and it culminated

21    obviously in the plea being signed this morning, and I know

22    the court has not had a chance to look at it, and I totally

23    understand that.

24              THE COURT:  I've looked at it.

25              MR. GOLD:  I'm sorry.

1          THE COURT:  I've looked at it.

2          MR. GOLD:  Okay.  The problem we have is if we

3     schedule this for next week on the 1st, then I believe what

4     will happen is Mr. Slaughter will be out, the substitution of

5     counsel, the counsel that they had thought might come in will

6     be out.  On the 1st then rather than a plea we'll probably

7     wind up having to appoint a public defender, which will then

8     take them --

9          THE COURT:  I'm sorry.  I'm not understanding,

10     Mr. Gold, the substitution will be out?

11          MR. GOLD:  In other words, I don't think the

12     person coming in will be able to resolve it then.

13          THE COURT:  Isn't this the same lawyer that in

14     the previous hearing you said -- well, Mr. Slaughter said has

15     been involved in the case since the inception?

16          MR. SLAUGHTER:  Your Honor, the problem is money,

17     and if for whatever reason the plea wasn't accepted by the

18     court, that lawyer would be then in for at least a two to

19     four plus month trial without any money.

20          THE COURT:  Okay.  Well, I mean from the court's

21     perspective, you know, we're not going to allow a series of

22     limited appearances up until the point in time where, you

23     know, if it comes to pass, the plea doesn't get accepted and

24     ultimately the case is set for trial and we don't have any

25     lawyer to represent Mr. Amodeo in regard to the trial.  So

1    that was the point in saying that by 2:30 tomorrow afternoon

2    you needed to either file a motion to withdraw and

3    substitution of counsel or thereafter we need a financial

4    affidavit from Mr. Amodeo and the court will appoint counsel

5    for him.  That's, I mean that is the schedule.  And in terms

6    of scheduling the change of plea, I've got October 1 and

7    October 3, those are the dates that I have available for you.

8    So I don't know what to tell you other than what we've

9    already discussed.

10                    MR. GOLD:  Okay.  Because my fear is that comes

11    the 1st, if neither of these lawyers are going to be in

12    because I don't think the person who would substitute would

13    file a notice of appearance without knowing whether the plea

14    would go through.  If that's the case, the public defender

15    would probably take up to a year to get up to speed because

16    there's 3 million documents in this case.  And I don't know

17    then whether there would have be a plea but rather a four

18    month trial then.  That's why, at least before the courtroom

19    deputy went back, if the court had time tomorrow before the

20    2:30 deadline, that would resolve the problem, because then

21    Mr. Slaughter would certainly know if the plea's accepted, it

22    takes away, I believe, most of the of the issues in terms of

23    the fee issue.

24                    MR. SLAUGHTER:  The fear of a trial.

25                    MR. GOLD:  And I certainly understand this

1    court's concern about this temporary appearance.  But that's

2    kind of where we're at and why we were hoping possibly if

3    there's any way at all to do it either tomorrow, Wednesday,

4    if the court would extend the temporary for the extra day,

5    and I just don't know the court's schedule.

6              I'm just trying to avoid a situation where we're

7    ready to go forward with a plea and then it turns into a

8    protracted thing where we wind up with a trial.

9              Your Honor, there may be one other alternative as

10   well.  I know that Judge Antoon normally does not take his

11   own pleas, but if your schedule is completely booked, would

12   you be willing to consider checking with Judge Antoon to see

13   if he would be willing to take the plea?

14             THE COURT:  He doesn't ordinarily take them, so

15   I'm not inclined to try and delegate (INAUDIBLE).

16             MR. GOLD:  I understand.  It was just a potential

17   alternative.

18             THE COURT:  You're anticipating an hour or so for

19   the change of plea?

20             MR. GOLD:  No more than that.

21             MR. SLAUGHTER:  Right.

22             MR. GOLD:  Because we've already been through Dr.

23   Danziger today.

24             THE COURT:  And that's the only testimony on

25   competency that we're going to have, right?

1              MR. GOLD:  Yes, sir.

2              MR. SLAUGHTER:  Correct.

3              THE COURT:  All right.  We can do it tomorrow at

4    ten.  We'll see you tomorrow at ten.

5              (HEARING CONCLUDED.)

6

7              I certify that the foregoing is a correct

8    transcript from the record of proceedings in the

9    above-entitled matter.

10

11                         *s/ Anthony Rolland*

12                         ANTHONY ROLLAND

13

14

15

16

17

18

19

20

21

22

23

24

25