UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

FILED
2009 OCT 14 PM 1:58
US DISTRICT COURT
MIDDLE DISTRICT OF FL

United States of America

v.

Case No. 6:08-cr-1796-Orl-28GJK
176

Frank L. Amodeo

_____/


NOTICE OF FILING OF AFFIDAVIT AND EXHIBITS IN SUPPORT OF MOTIONS

Comes Now Frank L. Amodeo and files this Amodeo's AFFIDAVIT in support of Amodeo's pending motions. Included with the AFFIDAVIT and incorporated by references into the AFFIDAVIT exhibit '1' - Statement of Facts with addenda, and exhibit '2' - Sample of Compiled Notebooks.

The Memorandum of Law is being filed under separate notice because of the unedited and hand-written nature of the Memorandum.

Respectfully submitted this 14th day of October 2009.

*[signature]*
Frank L. Amodeo
Federal Correction Complex-Low
P.O. Box 1031
Coleman, Florida 33521

## MEMORANDUM: AFFADAVIT

Every person involved in the case to date, including the District Court Judge, comments on the complexity of the case. In order to provide an understanding of the context in which the instant issues arise a Statement of Facts has been attached as exhibit "1" and is incorporated herein by reference.

By February 8, 2007, Amodeo had become a confidential informant and confidential witness for the government. In addition Amodeo was assisting Mirabilis' remaining principals in winding up the business and recovering monies for the IRS.

Amodeo's activities included 7 undercover surveillance operations not including after hour facility tours for the IRS and FBI, the preparation of detail compensation schedules, cash flow chart, and personnel files on over 64 key figures within the companies and more than 21 persons involved who were not employees or principals of Mirabilis.

Amodeo during this time collected and paid over 10 million dollars to the IRS, presided over disposition of additional assets which could result in 40 million dollars more being collected. Amodeo also set in motion lawsuits likely to generate tens of millions more in collections. These activities culminated in the sale during May 2007 of all Mirabilis' PEO's and staffing companies.

At the same time, AUSA Gold told Mark Burnett, Esq. then the general counsel of Mirabilis; if Burnett continued to work at Mirabilis, Burnett could expect to lose Burnett's license to practice law and possibly be charged with money laundering. Burnett resigned the next morning leaving Amodeo in possession of Mirabilis' assets.

1

This was consistent with a prior agreement between Amodeo and Gold. The essence of the agreement was Amodeo would not put Mirabilis in bankruptcy and Gold would not attempt to appoint a receiver. Further, Gold would allow Amodeo to wind up the affairs of Mirabilis and Mirabilis' eighty-some subsidiaries.

During the next six months, Amodeo continued winding up the affairs of these companies insuring all 44,000 W-2's were issued, insuring employee benefits recorded and paid, valid creditors' claims satisfied, etc.

Also, Amodeo defended the remaining assets from the spurious claims of certain creditors and former key personnel. Thereby preserving the aforementioned 40 million dollars for the IRS and five million dollars which had been used to pay legitimate claims and expenses; especially employee health claims.

One of the most unique achievements was Amodeo's collecting over 15 million documents and 1 terabyte of data. These were catalogued and organized into two warehouses and a computer database. Included amongst this evidence were emails that had been deleted from the computers of certain targets of the investigation. It was Amodeo who recovered the equipment and Amodeo's contractors who recovered the data.

All of this occurs under the watch of the U.S. Attorney's Office. Whenever these activities were discussed AUSA Gold et. al. would say "we do not want to know what your doing", we cannot really give you business advice and similar platitudes.

After one such meeting, once the agents had left, Gold told Amodeo to remember this liquidation "was on us" ... "and we would both be held accountable" for the outcome ... [if it went bad].

2

At around this same time Amodeo was told that Gold was going to Tampa to get a letter regarding Amodeo's <u>substantial assistance to date</u>.

Amodeo asked why Tampa? Special Agent Richard Smith then said, "You want a Tampa letter, it is much better"... than a simple recommendation from AUSA, even a deputy chief.

Amodeo conferred with counsel and was told particularly by Brian Phillips that the difference was Gold had authority for 4 levels and Tampa had up to ten.

Amodeo was told by Slaughter; Herb Hoelter (Hoelter), the sentencing expert recommended by Slaughter and Robert Panoff that Amodeo's cooperation was extraordinary and should Amodeo either plea or be convicted at trial Amodeo should receive closer to the ten levels than the four levels. (Hoelter suggested 15 levels would be objectively reasonable).

Just when it seemed Amodeo could help no more, Amodeo began to recover computer servers which were located in offices that were being closed. The time was in or about October 2007. These servers contained audio/video recordings of Amodeo's and Mirabilis' main offices.

The total time of these recordings is nearly 27,000 hours. More than 2,000 hours is relevant to the investigation and 400 hours directly relevant. The IRS did not want to take possession of the servers – in fact have still not done so – because they told Amodeo "... **these will contain too much exculpatory evidence ...**" we might have to provide other targets.

Amodeo went about reviewing, cataloging and creating snippets out of the recordings. The expense of which was hundreds of thousands of dollars including labor. (Total expenditures in assisting USAO not including such activities a W-2's exceed $2 million dollars).

3

Amodeo's efforts to recover monies for the IRS were being hampered by lack of money to employ counsel. Through effective use of former staff attorneys, who worked for fees which were more like wages, Amodeo had defeated just about all of the frivolous and spurious claims then pending. In an attempt to gain sufficient resources to pursue collection of the hundreds of millions of dollars owed to Amodeo's companies or to Mirabilis; Amodeo concentrated Amodeo's efforts on settling claims with SUNZ Insurance Co.

The SUNZ claim was not due for seven years, had a market value of less than a million – and only this much because <u>"Amodeo was crazy and would sue."</u> Amodeo persuaded SUNZ to settle for 5.5 million dollars. $300,000 was paid to SUNZ's third party administrator as a condition of settling, $770,000 was paid to the IRS as their portion of claim and the balance went to resolving virtually all remaining creditor claims and to pay legal fees to pursue over **<u>$100,000,000 in collection actions for the IRS.</u>**

Apparently at the same time as Amodeo was gathering the resources to pursue the collection plan, Slaughter and Panoff were negotiating with Gold about the language in the plea agreement. <u>Amodeo was **unaware** of these negotiations and had not committed to entering a plea.</u> Although Amodeo had previously had discussions with Panoff about possibly changing Amodeo's position if some future plea involved only the nonpayment of taxes – no fraud reference. As Panoff said "American public does not care about tax cheaters ... most of them do it themselves ..." This conversation occurred before Amodeo was aware of either 'specific intent' or 'Cheek'.

Amodeo next heard of a plea when presented with a proposed plea agreement for having violated 7202 of tax code on three occasions. The factual statement of the plea was materially wrong. Since a consequence of Amodeo's mental disorder is an inability to focus especially

4

when under stress. Amodeo asked attorney Aaron Bates ("Bates") to review the facts and suggest changes to Phillips (attorney Phillips was doing the drafting work for Slaughter and Panoff). Bates determined it was impossible to simply make changes so Bates rewrote the entire statement and sent the redlined version back to Phillips.

The Bates version was factually accurate and Amodeo was willing to sign the agreement; although anyone reading it was uncertain whether this factual predicate was really sufficient to support a crime.

Amodeo was called to a meeting at Slaughter's office in March 2008 purportedly to meet with the polygrapher. Amodeo had insisted on taking the polygraphs in order to refute the intent issue which might be implied from a plea agreement. At this meeting <u>Amodeo was told Amodeo must do a plea or Amodeo would be indicted</u>.

**Phillips reiterated that Amodeo's plea was not really an admission of guilt, but!!! "only what the government would prove at trial ..." so it was <u>not</u> necessary for Amodeo to agree with the facts or law only that a jury could believe the government. Especially since the government would be happy to bring witnesses "the government knew were lying ..."**

Amodeo was still not persuaded and continued to argue that the facts were not accurate. Panoff told Slaughter to show Amodeo the email. Slaughter then showed Amodeo an email from Gold. The email stated that if Amodeo did not sign the plea agreement <u>unchanged</u> by a certain date (3 or 5 days in the future), then the deal was off including any protection from civil forfeiture of the attorney fees which had been paid to Amodeo's criminal defense attorneys (Slaughter, Panoff and Phillips).

Amodeo asked Phillips what this meant and how they could get the fees. Phillips explained what was meant and how the fees could be seized; Phillips also reminded Amodeo

5

again that the government would make sure that all the principals of the company and other witnesses knew to say just the 'right thing'. Further Phillips indicated the USA would not hesitate to embarrass Amodeo's family or attack Amodeo's handicap stepson if Amodeo did not "give up" and enter a plea; as well as to forfeit and seize all assets possible.

Amodeo stated, "The USA has just declared war on the Empire – I no longer consider myself a citizen and would not want to be if this conduct is acceptable in this country." Amodeo met with the polygrapher, scheduled the polygraph session; then returned to Amodeo's office.

At the office Amodeo informed the staff of what had occurred and arranged for a court reporter to take and video a sworn statement in order to preserve Amodeo's demeanor and recollections contemporaneously with the events. *Copies available upon request.*

Next, Amodeo was told that the plea agreement was only going to be used by Gold to get authority to prosecute. Slaughter and Phillips explained to Amodeo that the plea would have to come back to Orlando and could still be renegotiated. Especially, in light of the new information developing on the extent of Amodeo's mental illness and the surprising results of the polygraphs. <u>Which contrary to the attorney's expectations showed Amodeo not guilty each of the four times the test was administered</u>.

Amodeo proceeded with the collection plans; until Amodeo was shocked by the forfeiture and seizure of certain of Amodeo's personal assets and the legal fees being used by the various law firms pursuing collection of the monies <u>to be paid to the IRS.</u> The affidavit supporting the seizure was at best grossly inaccurate.

After this was made known to Gold - Gold began an attempt to explain the facts in such a manner not consistent with what appears to have been Gold's view of the case but to cover the gross negligence or outright perjury of the IRS agent.

6

Amodeo was now at odds with Gold and the USA. Since from Amodeo's perspective Gold had violated both the agreements between Gold and Amodeo: the May 2007 agreement allowing Amodeo to liquidate the business and the March 2008 agreement <u>not to seize assets</u> which was supposedly a condition of getting Amodeo's signature on the second plea agreement.

Amodeo had approximately two months financial reserves and went about closing up operations, minimizing impact on third-parties.

At the same time Slaughter <u>took steps to have Amodeo declared incompetent</u> and Amodeo searched for a way to get Amodeo's innocent staff out of this situation without their breaching any corporate fiduciary duties or incurring any personal liabilities.

Slaughter was successful in getting Amodeo declared incompetent (Slaughter had Amodeo take a full dose of Seroquel the morning of each of Amodeo's evaluations as well as the day of the incompetency hearing). Amodeo remains legally incompetent to this date regardless of Amodeo's actual competency. The Florida judgment remains in full force and effect.

Meanwhile Amodeo was approached by Elizabeth Green, Esq. (of Latham, Shuker, Eden & Beaudine) and Amodeo's staff with a novel approach to Chapter 11. This approach would protect the staff because the business would pre-bankruptcy be transferred to independent Directors and Officers highly respected by the bankruptcy court. These individuals would have no prior relation to Amodeo or Mirabilis.

Green or Amodeo's staff informed both Gold and Slaughter of the filing. David Smith, Esq. wrote a brief opinion on whether bankruptcy retainer could be seized and the case was filed. This filing preserved millions and possibly tens of millions of dollars for the government.

Amodeo had completed Amodeo's polygraphs, all four of which Amodeo passed without a single indication of deception; then the State of Florida <u>appointed a guardian</u>.

Slaughter and Panoff had been told by Amodeo's wife, Claire S. Holland, Esq., that Holland was concerned Amodeo was getting the same treatment by Slaughter et. al. that Amodeo <u>had received from Amodeo's prior counsel</u>. Holland sent Slaughter the ABA standards to be used when an attorney discovers a client is mentally ill.

Slaughter takes this information and begins a concerted effort to void the plea because Amodeo has made it clear to Slaughter, Phillips and Panoff that when Amodeo is before the Court, Amodeo will say,

> "I only signed this plea because the government issued an ultimatum telling me if I did not they would seize my assets, immediately incarcerate me, cause me to lose my attorneys and embarrass my family. Further my attorneys at the same time assured me the government would convict me even if it required suborning perjury of witnesses."

After the guardian was appointed Amodeo was not allowed to communicate other than through the guardian.

Amodeo's psychiatrist arranged for Amodeo to receive evaluation from McLean Hospital in Belmont, Massachusetts. While at McLean Amodeo was indicted, the indictment looked much closer to complaints and "mock indictments" prepared by Amodeo's civil attorneys than the government's prior presentment of the case.

8

After the indictment, Slaughter called Amodeo to introduce a new attorney that Slaughter wanted Amodeo to bring aboard even though Amodeo had already spent over 1.2 million dollars to get to this point. The attorney was Kenton Sands ("Sands"). Sands either on this call or a subsequent call at Slaughter's urging assessed Amodeo's worse case to begin at no more than 144 months based on the minimum substantial assistance (4 levels) for which Amodeo was entitled. Amodeo's worse case would be further reduced by acceptance of responsibility (3 levels) and other mitigating factors which could lead to probation.

Amodeo agreed to meet with Slaughter, Sands and Phillips. The three met with Amodeo at McLean to discuss cost of trying the case if a new plea could not be worked out. Interestingly the money could not come from Amodeo because the fees would be tainted. This surprised Amodeo since the Amodeo's existing attorneys had not only received money from Amodeo but from Amodeo's companies, including $400,000 directly from the SUNZ Insurance proceeds. Amodeo was now left as a ward of the State, in a mental hospital and unable to retain trial counsel.

Harvard/McLean had determined that Amodeo's mental condition was severe and prepared a treatment. Amodeo then returned from McLean to be arraigned. Amodeo entered a plea of not guilty and was released on bond September 2, 2008.

September 2008 is the beginning of desperate efforts by Slaughter and Gold to get Amodeo to enter into a new plea agreement.

Amodeo is steadfastly refusing to agree to any statement of facts which is based on fraud or evasion. Amodeo is told by Slaughter the Government needs the fraud count because without it, forfeiture is not possible. The Government finally acknowledges "the plan was to use the tax dollars to build the business then to sell the business and pay the taxes" further the Government

9

agrees to letting Amodeo plead to an extremely vague set of facts and to have whatever time is necessary to tell Amodeo's story at sentencing.

It is important to recognize Amodeo has just been placed on a new regimen of drugs beginning September 1, 2008. This regimen includes a mood stabilizer known as Depakote and an antipsychotic: Geodon; plus a mixture of other medication.

The Depakote is prescribed to Amodeo at 150 percent the maximum recommended level and the Geodon is prescribed at a level sufficient to permit therapists to breakdown long-term, deeply in-grained beliefs, i.e. make Amodeo susceptible to suggestion.

In other words, Amodeo was then and is currently being medicated to an extraordinary level to permit Amodeo's therapist to influence Amodeo's belief system. The unforeseen consequence is to magnify an existing aspect of Amodeo's personality; which is to avoid conflict and seek approval of those Amodeo admires and trusts.

In September, the attorneys were functioning in a similar role to a therapist with regard to the factual predicate contained in the plea agreement.

As Sands will attest even medicated and malleable Amodeo was resistant to even the slightest indication of intent. Only Sands discovery of an Eleventh Circuit case that held recklessness as a basis for willful blindness gave Amodeo a way to truthfully sign the plea.

Amodeo did not believe recklessness could rise to willful blindness where specific intent was an element but at least Amodeo could truthfully sign the plea.

Amodeo's reckless conduct was <u>very specific</u>. Amodeo agreed it was reckless to not read the February 2006 memorandum prepared by Amodeo's attorneys at the law firm of Berman, Keane and Riguera. However, Amodeo knew the recklessness would be substantially or

10

completely mitigated by Amodeo's disorder which prevents Amodeo from concentrating or focusing on such document.

More importantly even if Amodeo had read the memorandum it <u>would not have been reckless</u> since the memo did not warn Amodeo the plan was illegal. In fact the memo could be read (would have been read by a bipolar-manic) to support the conduct as perfectly legitimate. (This was not discovered until seven months after the change of plea when Sands read the memo; apparently before Sands neither the government or defense team, like Amodeo, had bothered to read the memo).

After a long arduous month a statement of facts was created that Slaughter and Gold believed could be presented to the Court in such a way as get through the plea colloquy <u>without the Court knowing the true meaning of the words</u> or the wide gap between the parties.

Also, Amodeo was instructed to take a <u>dosage of the drug Seroquel</u> which was known to make Amodeo completely incoherent and incompetent under full dosage.

Amodeo read the plea to say the following:

> People other than Amodeo were engaged in a conspiracy or more accurately multiple conspiracies to not pay taxes since 2004 and continuing through 2006.
> Amodeo was aware of the conduct but not aware of any duty on Amodeo's part to alter the conduct; nor aware the conduct was criminal on the part of anyone.
> Amodeo may have been considered willfully blind by virtue of being reckless for not reading the February 2006 memo prepared by Berman, Keane and Riguera. This even though Amodeo's mental illness made it impossible for Amodeo to focus and read complex documents.
> Based on this farfetched theory of willful blindness Amodeo signed the plea agreement. (It was later shown by Sands the memo would have been read to approve the conduct not declare it illegal).
> Regarding the misleading a government agency, what Amodeo meant and informed Gold was that during the break in the mock deposition of August 29, 2006 Amodeo

11

>was advised by Edie Curry to change the presentation.
>Amodeo agreed to change the presentation and told Dan Myers, CPA ("Myers") and Sharmilla Khanokar, CPA ("Khanokar") to present the story as setout in the second part of the mock deposition. Myers and Khanokar agreed but never again had the opportunity to convey the story to the IRS.

Therefore Amodeo's view of the facts contained in the plea agreement exonerated Amodeo from criminal liability.

Although the above account was known to AUSA Gold and United States Attorney's Office, they presented a completely different picture to the Court and the public. Amodeo's attorneys have stated "Randy seemed desperate to get a plea." Prior to the change of plea hearing Sands and Slaughter came to Amodeo's house on a Sunday in an attempt to get the language worked out. Gold was available by telephone.

Amodeo eventually gave up and went along with the plea language above but conditioned on the following promises:

>1. Amodeo would be able to present Amodeo's side of the story which Amodeo believed would take 3 to 4 weeks and show the Court little or no basis existed for the guilty plea;
>
>2. Substantial Assistance downward departure of at least what was Gold's 4 level authority and a chance to convince the Court for a further reduction;
>
>3. A credit for all monies recovered from any source resulting in both a <u>reduction in time</u> (1 month per million as in the Pearlman case) and <u>financial liability</u>;
>
>4. An actual Three level reduction for acceptance of responsibility; and
>
>5. The ability to argue at sentencing diminished capacity as further mitigation.

12

In addition Amodeo was supposed to be entitled to a full trial on the Sunshine fee" issue and receive additional departures under at the very least Rule 35 for every subsequent prosecution.

Specifically, Gold told Amodeo, Amodeo would get "credit" for Vanderburg and everybody Vanderburg testified against or informed upon. Further Amodeo would get credit for the work Slaughter had done with Myers and anybody Myers informed upon.

Under these <u>combined promises</u>, <u>over medicated</u>, <u>without Amodeo's guardian present</u> and <u>so unfocused</u> as to not note Amodeo's home address was incorrect in the written plea agreement; and with Gold threatening (even swearing according to Slaughter) to <u>"pull the deal if not done now"</u> – Amodeo changed Amodeo's plea to guilty.

Amodeo would then spend the next eight months continuing to cooperate and assist the government. Amodeo at Amodeo's expense made various copies of various meetings, transcribed some of the undercover surveillance meetings, created notebooks on various targets of the investigation (tens of thousands of pages an example is attached) and located other documents as requested. *Attached as exhibit "2" is the Curry Notebook which is a sample of the work performed by Amodeo.*

Amodeo met with the agents on many occasions explaining not only issues in the case but issues the agents had about the industry and other PEO's as well.

In or about March 2009, Sands began to become concerned that more progress had not been made toward sentencing. So Sands and Amodeo began working toward creating a "statement of facts" which would be Amodeo's position paper. In or about the middle of April 2009, Sands sent a draft statement to the Government.

Although it appears the Government never read more than 50 pages, the "roof came off". The Government could not point to a single specific fact which was objectionable only that the statement as a whole minimized Amodeo's role. (Only then did it begin to become apparent the Government might renege on the deal).

The statement was no different from the position Amodeo had taken from the State, the position is consistent with audio-video recordings, written documentation and polygraphs.

The Government eventually would agree and stipulate the statement is an accurate recital of what Amodeo honestly believes to be true.

None the less, the Government then failed to <u>fulfill any promises</u> of the Government had made to Amodeo to induce the plea agreement.

Absent said promises none of Amodeo's attorneys would have recommended Amodeo enter a plea nor would Amodeo have agreed to a plea. (See affidavits).

Amodeo's decision to plea guilty would seem to be rational even though Amodeo <u>did not believe himself to be guilty,</u> based on the consideration promised by USAO.

Assuming for the argument the Government was correct and the starting level was 39. Reduce this by three levels for acceptance of responsibility now the worst case is level 36. Next reduce it by at least 4 levels for substantial assistance bringing the worst case to 32. This results in a sentence of not more than 135 months.

The number of months would be further reduced by 1 month for each million dollar recovered which Amodeo estimates to be greater than 100 million either already collected or anticipated as a result of Amodeo's efforts. The worst case is now 26 months.

14

This number will be further reduced because Amodeo who was described by Social Security as the "most manic man" ever evaluated, declared incompetent by the State of Florida and had the BOP go out of the BOP's way to modify a Supervised Release Order to ensure Amodeo got therapy committed the acts which constitute the crime while in the midst of an untreated manic episode.

Under these circumstances a sentence of 2 years or less as predicted by Slaughter was not unreasonable; nor was an alternative sentence which was home or institutional confinement while Amodeo completed the treatment plan established by Harvard/ McLean Hospital.

Therefore Amodeo's analysis was serving two years and hopefully nothing; as opposed to going to trial for up to two years with insufficiently funded court appointed attorneys. Still Amodeo readily believed and told his attorneys that after the judge heard the facts at sentencing the judge would reject the plea for lack of the specific intent element of the crimes.

The affiant states under penalty of perjury this affidavit is true and correct to the best of his knowledge.

10/14/09
Date

Frank L. Amodeo
Federal Correction Complex-Low
P.O. Box 1031
Coleman, Florida 33521

15